------------o-●-●------------

## KIMPTON *vs.* BRONSON.

Since the decision of the Court of Appeals in the *Metropolitan Bank* v. *Van Dyck*, (27 *N. Y. Rep.* 400,) holding that the act of congress, passed February 25, 1862, making certain treasury notes of the United States a legal tender in payment of debts between private persons, was constitutional and valid, the existence of the power in congress, to declare such treasury notes a legal tender for the payment of debts, must be assumed, to the full extent of the use made of it by congress.

A bond and mortgage were given to secure the payment of $1800 "in gold or silver coin, lawful money of the United States of America." The mortgagor, at the place and within the time specified in the securities, for payment, depos-

Kimpton *v.* Bronson.

ited to the credit of the mortgagee the amount of principal and interest due upon the bond and mortgage, in treasury notes of the United States. *Held,* that this was a payment of the debt; and that the mortgagee was bound to execute and deliver a proper discharge of the mortgage. GROVER, P. J. dissented.

THIS action was brought to procure the satisfaction of a mortgage executed by the plaintiff together with his wife, and delivered to the defendant. The mortgage, and the bond accompanying it, were given to secure the payment of $1800, "in gold or silver coin, lawful money of the United States of America," on the 1st day of July, 1864, with semi-annual interest thereon, from the 14th of May, 1859, which was the day of their date, according to the terms of ten promissory notes given for such interest in coin as aforesaid. The bond and mortgage were conditioned, that if the plaintiff should pay the sum of money secured, "in gold or silver money as aforesaid," at the times and in the manner mentioned therein, they should then and from thenceforth become void. By the terms of the bond, the principal and interest secured were payable at such place in the city of New York as the defendant should by writing appoint, and in default of such appointment, at the City Bank, in said city. No appointment in writing of the place of payment was made by the defendant, and on the 13th day of August, 1864, the plaintiff deposited to the defendant's credit in the City Bank of the city of New York, $1818 in United States treasury notes. This exceeded the principal and interest then due on the bond and mortgage, by the sum of $2, which was deposited to defray the expenses of a discharge of the mortgage. At that time $1 in gold or silver coin, was worth $2.55 in United States treasury notes in the city of New York. Notice of such deposit was given to the defendant on the 15th day of August, 1864, and he was requested to execute a discharge of the mortgage. This he declined to do, on the ground that the debt secured could only be discharged by a payment of the amount in gold or silver coin. Upon proof

of these facts, the court at special term, dismissed the plaintiff's complaint, with costs.    And from the judgment entered upon that decision the plaintiff appealed.

*John H. White,* for the appellant.

*Henry R. Selden,* for the respondent.

DANIELS, J.    The different acts of congress under which the treasury notes were issued which the plaintiff deposited to the defendants' credit for the purpose of paying and discharging the mortgage debt due to him, declare that such notes "shall be lawful money and a legal tender in payment of all debts, public and private, within the United States, except for duties on imports, and interest on the public debt." (*U. S. Stat. at Large, vol.* 12, 345, § 1 ; 532, § 1 ; 710, § 3.) Each act in this respect is substantially a counterpart of the others.    Since the organization of the general government, congress has been in the habit of prescribing the combinations, and weights, of gold, silver and copper coins, issued by virtue of its authority, and of declaring the extent to which they could be lawfully tendered in payment of debts. The composition and weight of the coins issued have not been entirely uniform, and, owing to that circumstance, not of the same intrinsic value ; but still congress has declared them to be the same legal or nominal value of those coins possessing greater intrinsic value, though limiting the extent to which they might be used as lawful tender for the payment of debts.    In 1834, when the act was passed providing for the composition and value of gold coin, it was declared that such coin should be receivable in all payments, when of full weight, according to their respective values.    (*U. S. Stat. at Large, vol.* 4, 699, § 1.)    And in 1837, the act declaring the composition and weight of silver dollars, half dollars, quarter dollars, dimes and half dimes, provided that they should be legal tenders of payment, according to their

nominal value, for any sums whatever. (*Id. vol.* 5, 137, § 9.) But three cent pieces, afterwards provided for, were declared a legal tender in payment of debts only to the amount of thirty cents and under. (*Id. vol.* 9, 591, § 11.) And when, without changing the composition of the metals, the weight of the silver half dollar, quarter dollar, dime and half dime was reduced, their use as a lawful tender for the payment of debts was limited to sums not exceeding five dollars. These statutes, together with the others relating to the same general subject, are referred to for the purpose of showing that the gold and silver coin of the United States are not, necessarily, intrinsically worth their nominal values, but are made to bear an arbitrary or conventional value by the mere force of legislation. And in the exercise of its sovereign authority over this subject, congress has the power of still further debasing the coin of the country, or reducing their weight, or both, as it may deem just and proper, and of prescribing that such coin shall be a legal tender for the payment of all debts within the United States. The only restraint upon the extent to which the power may be carried, is that which a general sense of expediency and justice imposes. The power itself is expressly conferred by the constitution, which declares that congress shall have power to coin money, regulate the value thereof, and of foreign coin, (*Art.* 1, § 8, *sub.* 5,) leaving the manner of its exercise entirely to the wisdom and judgment of congress.

But notwithstanding the fact that the treasury department of the government has frequently found itself compelled to issue treasury notes, under the power provided for that purpose by congress, they have never, before the crisis through which the country, owing in part to their assistance, has so fortunately passed, been raised to the standard of money, and declared a legal tender for the payment of debts. The power to do that in this instance has been, by many persons of great ability and intelligence, denied, and the exercise of it denounced as a usurpation of authority. It, however,

requires but a superficial retrospect of the events of the five years just closed, to convince a candid, unprejudiced mind that the government must itself have failed, and been overcome by the forces of the rebellion, if it had not been for the warlike facilities which these notes placed at its command. Without the power to issue them, and to give them the credit of money, its ability to perform successfully the great duties committed to its charge, would have been withheld from it. Accordingly, it was very properly maintained by congress, in conjunction with the executive, that the obligation to exercise the functions required in the discharge of such duties, necessarily carried with it the power of providing the means without which that could not be successfully accomplished. Whether that power is to be derived from the provision of the constitution, already mentioned, or the power to borrow money on the credit of the United States, or that of raising and supporting armies, or to provide and maintain a navy, or suppress insurrections and repel invasions, or from all of them combined, it is not necessary now to inquire. For the purposes of the present consideration of this case, the existence of that power under the constitution must be assumed to the full extent of the use made of it by congress; because the controversy regarding it has been already fully considered in the courts of this state, and finally set at rest by the judgment of the Court of Appeals, which triumphantly maintained it against every conceivable objection. (*Metropolitan Bank* v. *Van Dyck*, 27 *N. Y. Rep.* 400.)

The statutes defining the extent to which the coin and treasury notes of the United States may be rendered available as a tender for the payment of private or individual debts, in no manner discriminates between them, except so far as they limit the amounts that may be so used, of the silver coins provided for by the acts of 1851 and 1853. As to these, the limitations imposed, are that three cent pieces shall not be lawful tender for an amount exceeding thirty cents,

Kimpton *v.* Bronson.

and the half and quarter dollars, dimes and half dimes, issued under the act of 1853, to an amount exceeding the sum of five dollars. No such limitation, nor any other whatever, as to debts between individuals, is placed upon treasury notes. They are made a legal tender in payment of all debts, according to their nominal value. This is complained of as an arbitrary and unwarrantable exercise of authority. But it is the same in principle, though it may, from the manner of its use, be different in degree, as that which fixes and declares the value of gold and silver coin. In that case, it is not the commercial value of the article which alone determines its value as money, though that undoubtedly is an important element entering into the adjustment of it. But its value as money is determined by the legislative power of the country. That power declares that certain quantities of gold and silver metal alloyed, moulded and stamped, in the manner in which it provides, shall have specific and certain commercial values, which are ordinarily less than the real value of the weight and quality of the metals used. Under the exercise of that power, the coin acquires a greater value as money than it possesses as a marketable commodity. Precisely the same power is used, though it may be differently derived, which declares and impresses treasury notes with the value they purport to have upon their face. These notes are not altogether deprived of real or intrinsic value, for they were issued upon the credit of the government, and have the good faith and responsibility of all the people pledged for their ultimate redemption. The conviction of that being the case, though not perhaps quite as tangible to the senses, should produce an assurance of actual value for them, equal to that created by the intrinsic value of gold and silver. It was not a mere arbitrary value, therefore, which congress provided them with, but one of an actual nature, which, at no remote day, will extinguish the obligations they create, with gold and silver coin.

That this value has been depreciated is certainly true, but

it was done without diminishing the obligation of the paper, and in the absence of all improbability of its final redemption. It is not paper alone of this description that has been rendered liable to depreciation, though it is ordinarily more liable to it than gold or silver, for that to the extent of its intrinsic value has a circulating value among all the civilized nations of the earth, while paper is necessarily limited in its circulation to the nation under whose authority it issues. But whenever the value of property is inflated or reduced, that of gold and silver coin is also correspondingly diminished or increased. Changes of this nature frequently occur in all countries engaged in trading or commercial pursuits. And they are occasionally so great as to be productive of very distressing financial consequences. On that account, debts contracted when the prices of property are unusually stimulated, are paid with greater difficulty, and by greater sacrifices after such prices have receded, while those contracted when such prices are low, are more easily paid, and with less sacrifice of property after those prices have again advanced. In one case the debtor actually pays less to extinguish the same indebtedness than is required for the same purpose in the other, though the actual amount of money used, is the same in both. Coin, through all the commercial changes it may pass, retains the legal value impressed upon it under the authority of the government, even though the holder of it may be unable to realize half as much with it at one time as he could at another. The same considerations apply in the same manner to the legal tender treasury notes. The law has impressed them with a legal value precisely equal with that of gold or silver coin of the same denominations, for the purpose of paying individual debts with them. And it can not permit a discrimination against them, in favor of gold and silver, without allowing its authority to be substantially annulled. However the fact may be as to the value as a mere commodity, for the purpose of paying individual debts, a treasury note for the sum of $1, is as completely a legal

Kimpton *v.* Bronson.

dollar, as a piece of metal of a certain weight and quality impressed as the law directs, is a legal dollar. The one is no more so than the other, for those purposes that the laws have declared them to be of equal value. Where those laws are supreme, that value must be observed and secured by courts of justice. For they are required to execute and carry, the laws into effect as they are found, without endeavoring to accommodate or conform them to the accidental or unprincipled depreciations produced in the currency of the country, by the tricks and devices of boards of stockholders. These laws place the paper dollars of the government upon the same stand and value, they do its gold and silver dollars, for the purpose of paying the indebtedness of one individual to another. They are a lawful tender for the payment of such debts, not for their value in New York or elsewhere, but for the value declared upon their face.

The substantial point involved in this controversy is whether the obligation of the plaintiff, under the bond and mortgage, resolved itself into a debt, so as to be brought within the operation of these laws. That term has been differently defined, owing to the subject matter of the statutes in which it has been used. Ordinarily, it imports a sum of money arising upon a contract express or implied. (*Matter of Denny,* 2 *Hill,* 220.) In its more general sense it is defined to be that which is due from one person to another, whether money, goods or services; that which one person is bound to pay or perform to another. (*Newell* v. *People,* 3 *Seld.* 124.) Under these statutes it seems to import any obligation by contract, express or implied, which may be discharged by money through the voluntary action of the party bound. Wherever he may be at liberty to perform his obligation by the payment of a specific sum of money, the party owing the obligation is subject to what, in these statutes, is termed debt.

If the obligation in this case had been such as required the delivery of one thousand eight hundred gold dollars, and

not as it was, to pay one thousand eight hundred dollars in gold or silver coin, its construction must necessarily have been different. For then it would be in no sense a debt within the contemplation of these statutes, and could not be affected by their provisions declaring treasury notes a lawful tender for the payment of debts. In the case supposed, the obligation would regard dollars not as currency, but as articles of traffic, or commodities merely, and it could only be performed by the actual delivery of the number and kind of dollars described in it. And in case of failure to perform it, the defaulting party would be liable for whatever value they might have at that time, as distinguished from treasury notes. The damages to be recovered would be the market value of the articles agreed to be delivered. A demand of such a nature would not be a debt, and therefore not within these statutes, until its amount should be determined by the judgment of a court upon it. This distinction distinguishes this case from the obligations of bailees or carriers, who may undertake to carry and deliver specified quantities of gold or silver coin. The obligation is to carry and deliver the identical article received, and no other. And it can only be discharged literally by making such delivery, or paying the value in the market of the article agreed to be delivered. The same principle would apply to the case of a person who should unlawfully convert or appropriate the gold or silver dollars of another. For the purposes of satisfaction, the article converted or appropriated, though generally used as currency, would be treated merely as property, and its highest market value allowed by way of damages. Until such damages are ascertained and determined by a judgment, they do not in law constitute a debt, and therefore can not be discharged under insolvent or bankrupt laws providing for the discharge of the debts of the insolvent or bankrupt. (*Crouch* v. *Gridley,* 6 *Hill,* 250. *Kellogg* v. *Schuyler,* 2 *Denio,* 73.) But in this case no specific dollars were to be delivered by the plaintiff to the defendant. His obligation was to pay a

Kimpton *v*. Bronson.

specified number of dollars, not to deliver dollars of a specified quality. And as such, it could be extinguished by any thing possessing the legal value and character of that quantity of dollars. An obligation to pay in silver dollars can be well discharged by a tender of gold dollars; because the law, without regarding any difference between them in the market, has declared them of equal value for that purpose. If it had not done that, the same quantity, value and form of gold would not discharge the obligation without the actual assent of the creditor. For its efficacy, as a tender, by the mere election and act of the debtor, is derived altogether from positive legislation. Without that, neither gold nor silver coin would be a legal tender for the payment of debts, in any case whatever, unless the contract expressly stipulated that it should be so. With such legislation, not only gold and silver, but every thing else constitutionally declared by it to be so, must be held by courts of justice a legal tender, to the amount and value placed upon it by the law. For that reason they are bound to sanction and enforce the discharge of all such obligations as create debts, by the tender and payment of treasury notes, precisely the same as though an equal nominal amount of gold and silver coin were made use of for that purpose. For the accomplishment of that result, the law has made them the legal equivalents of gold and silver coin of the same denominations. Any different construction would be productive of very great injustice, not only in this case, but in all others where the debtors had inadvertently promised payment of their debts in gold or silver. For if the creditor should be permitted to recover the market value of gold or silver, as distinguished from its legal value, he might, by recovering judgment against his debtor when the premium was the greatest, collect as much more than the real debt owing to him, as that premium then exceeded the market value of treasury notes. For, by holding his judgment and delaying its collection, as he lawfully might, until the difference between the cheaper legal currency in which

it would be payable and gold and silver entirely disappeared, it would be as easy for the debtor to pay then in the latter as it would in the former. And as he would be bound to pay in one or the other, the creditor would recover so much more than his actual debt, as treasury notes were depreciated below gold and silver when the judgment was recovered. The law intended to subject debtors to no such consequences as these.

No injustice will ordinarily result to the creditor from the construction already given to the statutes and covenants in question. For although the creditor may be compelled by it to receive payment of the debt due to him, in notes depreciated below their nominal value in the market, the period of that depreciation will soon pass over, and their actual value be restored to that of gold and silver. And at all times, even when most depreciated, they have been convertible into stocks and bonds of the United States, upon which the interest, and at their maturity, the principal, were payable in gold and silver coin. No persons have had less ground for complaint against treasury notes, as a legal tender, than the capitalist. For though obliged by law to receive them at their nominal value, he has, at all times, had the ability to invest them for the same amount, at legal rates of interest, and when the time for their redemption arrives, he has the responsibility of the government for their payment. Whatever losses their depreciation may have entailed on those who received them for their labor, and expended them for their sustenance, none of those losses have been borne by him, as long as the amount of his capital has continued unimpaired.

That the covenants of the plaintiff, in the bond and mortgage, should be construed to be an obligation for the payment of money merely, and not for the delivery of eighteen hundred gold or silver dollars, is settled by authority, in this state. That question was very clearly presented in a case entirely analogous to the present one, and disposed of against the position of the present defendant. The action there was upon three notes, similar in form, by one of which the de-

fendant promised to pay the plaintiff seventy-nine dollars and fifty cents, on the first day of August, 1822, in salt at fourteen shillings per barrel, in good boating order.   Upon the trial of the action, the jury found a special verdict, upon the principle that they were to be governed · by the number of dollars and cents specified in the notes, and not by the fair cash value of salt per barrel at the time when the notes became due.   The court of common pleas gave judgment, upon the verdict on this principle, which the Supreme Court reversed.   The case was then taken to the Court of Errors, where the judgment of the Supreme Court was reversed, and that of the common pleas affirmed.   (*Pinney* v. *Gleason*, 5 *Wend.* 394.)   This decision necessarily settled the demand, in that case, to be a debt, when the defendant had failed to deliver the salt in which he had agreed to pay it.   There is no difference in principle between that case and the present one.   For it is not material what the debtor agrees to pay in, provided the agreement be, that he will pay a sum certain. In that case the debtor had agreed to pay the money mentioned in salt, at fourteen shillings per barrel; in the one at present under consideration, to pay eighteen hundred dollars in gold or silver coin.   The conclusion was the same in a case decided in Connecticut, where the debtor promised to pay $250 in cotton at thirty cents per yard.   For it was there held that the sum of money, only, could be recovered in the action.   (*Brooks* v. *Hubbard*, 3 *Conn.* 58.)   See also to the same effect, *Fletcher* v. *Derrickson*, (3 *Bosw.* 181.)

It can make no difference in the application of the rule prescribed by the statutes, that the bond and mortgage in suit were executed before their enactment, for the rule of the common law is general, allowing all debts to be discharged by that which may be lawfully tendered at the time when payment of them shall be made.   Where the consideration of this rule was incidentally before the Supreme Court of the United States, in an action for the equitable equalization of certain rents, under a statute of the state of

Virginia, Chief Justice Marshall stated it to be the law of the contract, that "all moneys accruing under it, which were not received during the currency of paper, would be payable in such other money as might be current at the time of payment." "According to the law which existed when the deed was executed, that consideration would be payable only in gold and silver coin, when gold and silver coin should become the only currency of the country." (*Ford* v. *Marstella,* 2 *Cranch,* 10. 1 *Curtis,* 428, 435–6.)

This principle has been applied to the payment of debts contracted before, as well as those contracted since treasury notes were declared a legal tender, even though the terms of the contract provided for their payment in specie, or gold and silver coin. Before the enactment of those statutes, all debts were payable in gold or silver, where they were not expressly agreed to be payable otherwise. And where the contract expressly declared them payable in gold or silver, it only expressed what the law, without that, as explicitly implied. They have accordingly been regarded and construed as being in substance the same, whether that intent was expressed or merely left to be implied by law. Congress has intervened by means of these statutes, and for the purpose of promoting the paramount interests of the country, so far defeated that intention, whether expressed or implied, as to allow all private debts to be paid with treasury notes. The obligation to receive them, is no higher in one case than it is in another. It applies to all to the same extent and in the same manner. Accordingly, the Supreme Court of Iowa held that a note dated in October, 1860, for $700, payable in United States gold, could be lawfully and properly paid by the payment of that amount of treasury notes. (*Warnibold* v. *Schlicting,* 16 *Iowa R.* 244.) And the district court of the county and city of Philadelphia held that a bond for twenty-eight thousand dollars "in specie current gold and silver money of the United States," could be discharged by treasury notes in the

same manner. (*Shoenberger* v. *Watts, vol.* 10 *Am. Law Reg.* 553.)

The same ruling was made by the Supreme Court of Massachusetts, upon a note dated in December, 1861, for $500, payable in specie. (*Wood* v. *Bullens,* 6 *Allen,* 516.) And by the Supreme Court of Michigan, in an action upon a bond, $500 of which was payable in gold. (*Buchegger* v. *Schultz, vol.* 14 *Am. Law Reg.* 95.) And by Justice Agnew, of the Supreme Court of Pennsylvania, where the action was on a lease by which the rent was made payable in lawful silver money of the United States of America. (*Schollenberger* v. *Brinton,* 13 *Am. Law Reg.* 591.) In the case of *Wilson* v. *Morgan,* (30 *How. Pr. R.* 386,) more recently decided by the Supreme Court of New York, the same principle was made to govern the payment of freight arising under a charter party made in Calcutta, by the terms of which it was payable "in silver or gold dollars, or by approved bills on London," if the cargo was unladen and delivered in the United States. (*See also Swanson* v. *Cooke, Id.* 385.)

Other cases were cited upon the argument of this cause, by the defendants' counsel, which it was insisted maintained a different conclusion and should, therefore, exercise a controlling influence in the disposition of it. Some of those cases, it will be seen upon an examination of them, are entitled to no weight whatever in that respect. That of *The Nova Scotia Tel. Co.* v. *Am. Tel. Co.* (13 *Am. L. Reg.* 365,) is a case where the lease, whose construction was involved, was made and the rent reserved by it was payable, and the action for its collection prosecuted in Nova Scotia. It did not come within the terms of the acts of congress, because they only declare treasury notes a legal tender "within the United States." As to what should be a legal tender in that case, it depended entirely on the laws of that Province after a failure to pay in the manner the lease provided for. The case of *Carpenter* v. *Atherton,* (13 *Am. Law Reg.* 225,) arose under a statute peculiar to the state of California, which pro-

vided that judgments in the courts of that state should be pronounced in the coin or currency in which the contract involved was expressly made payable. And upon a sale of property to satisfy them, the bid of the purchaser was required to be made in the same coin or currency. The validity of this statute was involved in that case, in view of the legal tender laws of the United States. And the court pronounced it constitutional. Whether that judgment was correct or not, it is not necessary to inquire, at this time; though there are very weighty reasons for sustaining a different conclusion from that which the case maintains, as will be seen from the decision of the Court of Appeals, in this state, in *Kneettle* v. *Newcomb,* (22 *N. Y. Rep.* 249.) A great principle of public policy exists in favor of maintaining the laws of congress on this subject, which should not be permitted to be invaded, either by the contracts of parties, or the legislation of states. Otherwise, statutes, enacted by the general government for the promotion of the public good, will be effectually nullified and overthrown by the legislatures of such states as may entertain different opinions concerning the best manner in which it can be subserved.

The decision of the special term in the case of *Luling* v. *The Atlantic Ins. Co.,* (30 *How. Pr. R.* 69,) was made upon the course of business which the company had instituted between itself and those insured by it. Such as paid premiums in gold, were entitled to their dividends and the adjustment of their losses on that basis. And it was to enforce that regulation of its business that the action was brought. The question in this case was not considered. That of *Councer* v. *The Steam Tug Griffin,* (vol. 14, *Am. Law Reg.* 45,) was brought to recover the value of a scow lost in Canadian waters, by means of the carelessness of those navigating the tug which had her in tow. The demand to be adjudged was not a debt, but the value of a specific article of property in the currency that could be lawfully used to satisfy the decree. The difficulty in the case arose out of the

circumstance that the witnesses in their evidence concerning the value of the scow, mentioned Canadian instead of American, value. If the loss had occurred in American waters, the witnesses called to prove the value, would have done so by referring it directly to the treasury note standard. For the business of the country, as well as the proceedings of courts, had been necessarily, and insensibly, accommodated to that standard of value.

Among the other cases referred to, is that of the seaman's action for wages against the ship *Rochambeau*, decided by Judge Ware, in the United States District Court, in Maine, which if correctly reported, is in direct conflict with the acts of congress declaring treasury notes a legal tender. For although the contract of shipment was made in a foreign country, the libellant was endeavoring to enforce payment of the debt created under it, in a court of the United States, where the statutes constituted the supreme law. The decision of it, necessarily discriminated between those instruments, or articles of currency, which that law declared to be equal for the payment of debts. And for that reason it is entitled to but little consideration as authority on the present question. No report of the cases of *Thompson* v. *Riggs*, *Philadelphia Railroad Co.* v. *Moulson*, or of the case in the Court of Chancery in the state of Kentucky, have fallen within my reach. And on that account they have not been more particularly referred to. But even if the information concerning them should prove entirely accurate, upon which the argument of the defendant's counsel was made, they could not properly have the effect of overcoming the accumulation of authority already cited establishing a different conclusion.

The fact that other laws of congress, and the practice of the treasury department, for purposes other than the payment of individual debts, distinguish between legal tender notes and gold and silver coin, does not affect the present controversy. For it is not within those laws, or in any man-

ner governed by that practice. On the contrary, the proper disposition of it is entirely dependent upon the true construction of the obligation in suit and those statutes alone, which define what may be lawfully used for the tender and payment of debts, between individuals. Under that construction, the debt in question has been paid by the deposit of treasury notes by the debtor, in the manner provided for in the bond and mortgage, and the defendant should have executed and delivered the proper discharge, when he was requested to do so by the debtor.

The judgment of the special term should be reversed, and judgment directed for the plaintiff, adjudging the mortgage paid, and that it be satisfied of record.

As the case of *Rodes* v. *Bronson,* executor, &c. is entirely dependent upon the same point, a similar disposition should also be made of that.

MARVIN and DAVIS, JJ. concurred.

GROVER, P. J. (dessenting.) The importance of the principle involved in the present case calls for a brief statement of the reasons which have led my mind to a different result from that arrived at by my associates. In the first place, it is proper to consider the first position assumed by the counsel of the appellant. That position is, that by the plaintiff's neglect to appoint a place in the city of New York at which payment should be made, the officers of the City Bank in said city became, by the provisions of the contract, the agent of the plaintiff to receive payment thereon, and credit the same to the plaintiff upon the books of the bank, and that, therefore, any thing received and credited by the bank officers as cash, operated as payment upon the mortgage the same as though received by the plaintiff. The only authority that it is pretended the officers had, was conferred by the contract and default of the plaintiff in appointing another place of payment. The contract, in that event, provides that such

payment, that is the payment called for by the contract, may be made to the City Bank of New York and credited to the plaintiff. It will be seen that no authority is conferred upon the bank officers to modify the contract in any respect, but only to receive the payment specified in the. contract, and credit the same to the plaintiff. In this way only could they effect a satisfaction of the contract and a discharge of the plaintiff's lien. Had the bank officers received bonds of any, of the states or of the United States and credited the same in kind to the plaintiff, it would hardly have been contended that it would have operated as payment of the plaintiff's mortgage; yet the principle of the. counsel's position is, I think, the same. If the plaintiff, by the contract, could only be paid in gold and silver coin, lawful. money of the United States, he was entitled to have a credit for such coin by the bank, so that he could compel the bank to pay such coin to him. I think if the plaintiff (upon the assumption that the defendant could only be paid in coin) had procured the City Bank to credit the plaintiff with coin so as to render itself liable to the plaintiff therefor, he would have discharged the obligation to the plaintiff irrespective of the consideration received by the bank for such credit. The defendant procured no such credit by the bank to the plaintiff. This brings us to the important question in the case, which is: "Can the defendant compel the plaintiff to accept payment upon the contract in the present case, in United States lawful tender notes?" If he can, the judgment appealed from is erroneous, and should be reversed. If not, it is correct and should be affirmed with costs. The first proposition to be determined, obviously, is whether the various acts of congress declaring treasury notes a lawful tender in payment of all private debts are constitutional and valid; and whether if such acts are constitutional and valid, they are applicable to contracts made previous to their passage by congress. These questions have been decided against the plaintiff by the Court of Appeals in *Meyer* v. *Roosevelt,* (27. *N. Y. Rep.* 400.) It is

clear that it is the duty of this Court, in its judicial action, to regard the doctrine held in that case as the law of the land, until reversed by that Court or by the Supreme Court of the United States, although as individuals we might regard the decision as based upon entirely mistaken views of the legislative powers conferred by the constitution upon Congress. The doctrine must at present be regarded as settled, that all private debts, no matter when contracted, if payable in money, without any specification as to kind, may, at the option of the debtor, be paid in lawful tender, government notes, pursuant to the act of congress. The Court of Appeals have, in the case decided, gone to this extent, but not beyond. An examination of the various acts of congress upon the subject of the currency will show that at present we have several kinds of money, all of which are lawful tender in the payment of debts generally. This money consists of the gold coinage of the country of various dates, differing slightly in value, of similar silver coinage varying somewhat in value, and of United States treasury notes, made by act of congress lawful tender in payment of private debts. It is scarcely necessary to remark that the difference in value between the various coinages of gold and silver is wholly attributable to the different quantities of those metals contained in pieces of the same denomination, as it is self evident that gold and silver can not fluctuate in value when compared with the same metal. The fact of this difference in value between coinages of different dates, containing different quantities of the precious metals, proves, (if any proof was wanting,) that the value is intrinsic, and but slightly affected by the stamp of the government, and the fiat of government making it a lawful tender in payment of private or public debts. It is equally evident that the value of the lawful tender government notes is substantially independent of the act of the government declaring them a lawful tender in payment of debts private, and of some public debts. That value depends to a very limited extent, indeed, upon the lawful

tender quality, but upon the intrinsic value of the notes. That value is the credit of the government that has undertaken to redeem them. It was an ingenious contrivance making them lawful tender. The effect was, as might readily have been, and by the contrivers was foreseen, to make the government credit the standard of all other values, and thus preserve that credit at apparent par through all the vicissitudes of a long and exhausting war. This was the advantage derived therefrom. It is wholly unnecessary to advert to the evils, if any, as such have no bearing upon the question under consideration. Making this government credit the standard, created great apparent fluctuations in values of every thing else. Thus gold and silver coin at times, when government credit was high, was at a slight premium as it was called, and in dark hours when such credit was greatly depressed, it was at a premium of one hundred and eighty, that is, two hundred and eighty of paper was but the equivalent of one hundred of gold. The fluctuation in other commodities was great, but perhaps not equally so, as other elements, to some extent, always affect the price of the latter more or less. This apparent premium upon gold and silver was in reality nothing but the depreciation of the government paper. The question in the present case is, whether parties may in their contracts protect themselves from this depreciation. In other words, whether a man in selling real estate upon a long credit, can, under existing law, protect himself from this depreciation without renouncing all benefit of the coinage, to determine the quantity and fineness of the metal he is to receive in payment. If he can, it must be done, as in the present case, by providing in the contract for payment of a given sum in gold or silver coin. Why may not parties so contract? Is there any thing unlawful or against public policy in such contracts? The law provides all the kinds of currency. It makes all a lawful tender in the payment of debts. It follows, it is equally as lawful to deal in one kind of currency as another. Con-

gress has not made dealing in gold or silver coin as a medium of payment unlawful. Hence the advocates of the omnipotency of congress over the question of currency and lawful tender need not be alarmed at this doctrine ; parties having the legal right, in their dealing, to protect themselves against the fluctuation of one kind of currency by providing that payment shall be made in one more stable. The next inquiry is whether these parties did so provide in their contract ? The language in the contract is, for the payment of $1800 in gold or silver coin, lawful money of the United States. This language requires no construction ; it can be made no plainer. The counsel for the appellant insists that this can can not be so, for the reason that at the date of the contract no one could have anticipated the making of government notes or any thing but gold and silver coins lawful tender, and that it was therefore a meaningless provision in the contract. The answer to this is, that every one is presumed to know the law of the land in which he resides and transacts business. The constitution of the United States is the supreme law, and these parties must be presumed to have known as well as the present Chief Justice of the United States, that congress possesssed plenary power to make any thing lawful tender which in their opinion might promote the welfare of the country, and that they might lawfully in the exercise of such power, make some lawful tender, which, before the expiration of the credit, would be worth but forty cents on the dollar in gold and silver coin, and that the clause was inserted to protect the plaintiff against such risks. The remaining question is, " whether the contract being lawful, the courts of either law or equity can enforce it so as to effectuate justice between the parties ?" This question must be answered in the affirmative, or it is a reproach upon the law. I know the mind is at first startled by the novelty of the various questions that present themselves. It at once inquires, can a paper dollar, which the law declares shall be a lawful tender for one dollar, be legally regarded as worth

Kimpton *v.* Bronson.

less ? Can a gold dollar which the same law declares a lawful tender for a dollar, be legally regarded as worth more ? Can the law recognize a difference in the value of dollars ? These are questions not settled by judicial decision. I say not settled, for the reason that although there have been, since 1862, some decisions of courts upon each side, yet there is nothing that prevents the questions being considered entirely original and to be settled upon principle.

In considering these questions, it is necessary to consider what constitutes value. Does this consist solely of utility in paying debts ? Is its measure to be determined by the answer to the inquiry for how much is it a lawful tender ? If so, wheat has no value, or any of the real and personal property of the country, except the currency made legal tender by law. What is the measure of value ? It is, and must for all commercial and legal purposes, be the amounts of the least valuable lawful tender it will command. An examination of the acts will show that congress has not attempted to determine any value as intrinsically inherent in currency. They have only provided for how much it shall constitute legal tender. We have already seen that all the kinds of currency have an intrinsic value wholly independent of their lawful tender qualities. There have been times when a gold dollar was worth two and eighty-hundreths paper dollars, although the gold dollar was lawful tender but for a dollar, and the paper equivalent for $2.$\frac{80}{100}$. Of course, this difference is entirely independent of the lawful tender qualities of either. This intrinsic value congress has not attempted to interfere with. I say this to show I am not trenching upon the principles of the strongest advocates of congressional power. I concede, in the fullest manner, that under the decision of the Court of Appeals the paper is lawful tender, and that every dollar will cancel a debt of one dollar, and that the gold dollars will, as tender, go no further than the paper; but for other purposes, but few are so ignorant at this day as not to know that their respective values are

widely different, which congress has in no respect attempted to interfere with. What difficulty is there in the way of the courts recognizing this difference in value for purposes other than lawful tender? Congress has created none, the state legislature has interposed none, and I am right sure that no maxim of the common law, (the perfection of human reason,) will be found in the way. What legerdemain compels courts to ignore in their judgments facts as patent as the meridian sun? I think it clear that courts not only may, but are bound in duty to recognize and act judicially upon the difference. They must do so or utterly fail in administering justice. Surely, had a man borrowed one hundred dollars in gold coin at the time the tender in the present case was made, and agreed to repay it the next day in similar coin, and had taken forty dollars of the coin and had purchased therewith one hundred dollars lawful tender notes and tendered the same to the lender, the law would not adjudge the borrower to have performed his contract and dismiss him from court with costs on the ground that the lender was making a false clamor against him. But how can a court of law furnish an adequate remedy for the breach of a contract to pay in currency of a particular kind? That question is not directly in the present case, but if law can redress such an injury, much more can equity, where it has cognizance. It has heretofore been considered the glory of the common law, that its principles required the application of right reason to new cases as they arise. By so doing, justice is surely attained between litigants. By a failure so to do and adhering to technical reasoning—that you can not recognize and act upon truths known to everybody—right is defeated, the law becomes impotent, and it may truly be said, by modern probity, if any, justice has fallen in the streets and equity can not enter the courts. The remedy in courts of law for breaches of contract is an award of damages equivalent to the loss occasioned by the breach. The process is the same when the breach consists in failing to deliver or pay coin, as it is in fixing

Kimpton *v.* Bronson.

damages in any other case. The lawful tender of least intrinsic value is taken as the standard, and a sufficient amount of this awarded to the injured party to make good the loss sustained by the breach. This is done in all cases of awarding damages for breach of contract. If the action is for breach of any contract to deliver property, the damages are uniformly assessed in the lawful tender of least intrinsic value. That this was the only course to administer justice was so obvious that it was adopted universally without discussion and, almost without consciousness that such a rule was acted on. No one ever heard, when the question was as to value of a horse, when the gold dollar was worth two in paper, that damages were assessed upon the gold basis ; and yet the same complaint would be equally applicable to all such assessments as is now urged against applying the same rate to cases where the contract is to pay in coin. That complaint is that, by a diminution of the premium on gold, or what I regard as the same thing, an appreciation in the value of public credit, which of course increases the intrinsic value of paper after judgment, the creditor will receive too much. To this it may be answered, that it is equally probable that he will lose by an increase of the premium. The chance of gain or loss is inseparable from the use of lawful tender money of constantly fluctuating intrinsic value. The ignorant believe that it is gold and silver that fluctuates, and that paper is uniform in value ; and I think, from their reasoning, that some judges are possessed with that idea. I regard the point too clear to require argument. The debtor can always protect himself from any such loss by prompt payment. It is a great mistake to suppose that the lawful tender paper is in fact of equal value in the payment of debts with gold coin. A man owing $12,000, and having all his property in lawful tender paper amounting to $10,000, is insolvent. The same debtor having the same amount of gold coin can now, by exchanging coin for paper, pay every cent and have something left, and there have been times when his balance would have been

more than the whole debt owing.   It is a legal fiction, contrary to a universally known truth, that paper made lawful tender by congress is of equal value with gold coin in the payment of debts.   There may have been debtors of that stern integrity who, having received the consideration upon a gold basis, have felt it their duty to pay the debt in something of equivalent value; but I feel sure that there never was one, fool enough to act upon the belief, when gold was at a premium, that gold was of no more value than paper to pay debts, and for that reason to pay his debts in coin.   The case is now presented of the country having different kinds of lawful tender money, differing widely in their intrinsic value.   My conclusion is that it is entirely lawful for parties to contract for payment in any specific kind of this currency, and that when they have so contracted, the rules of law enable, and those of justice require, the court to enforce such contracts and afford adequate redress in case of breach, the same as any other lawful contracts ; and they must do this or there is a failure of justice occasioned by the impotency of the common law, a reproach to which I think that system of jurisprudence not subject.

A point not in this case was somewhat discussed — that is, whether the time of the breach of the contract, or of the trial, was to be taken for the assessment of damages.   I think right reason requires that of the trial to be adopted.   I am aware that the time of breach is the time at which damages upon contracts generally are assessed.   That, in such cases, works out justice.   The object is effected by giving an adequate compensation for the injury.   In most such cases, the value of commodities change, and therefore value at the time of breach is more likely in the great mass of cases to afford just redress ; but when the question is between gold and silver coin and lawful tender paper, the value of the coin does not change, that of the paper does.   The party injured is entitled to his coin and interest at the time of trial.   This precisely compensates his injury, neither less or more.   I have

Kimpton *v.* Bronson.

hitherto considered the present as a case at law; I have not, however, fallen into the mistaken idea that it is so in fact. It is a case where the plaintiff applies for the exercise of equity jurisdiction in his behalf. It is the settled maxim that he is not entitled to this unless equity and good conscience require it. What equity has a man, who, for an adequate consideration, has agreed to pay gold or silver coin and has tendered something of four tenths of the value thereof, as performance? I can see none. I regard the conscience as any thing but good that will permit its possessor to borrow gold coin and contract to repay in similar coin, and then attempt to discharge the obligation with the same normal amount of lawful tender notes, worth less than half as much as the coin. Should the government attempt to pay in depreciated paper, debts agreed to be paid in coin, every right thinking man would pronounce its conduct infamous. And will courts of justice pronounce similar conduct of individuals agreeable to equity and good conscience? I can not so regard it. This is the most important commercial question considered in the courts of this state, except that of the constitutional power of congress to make paper a lawful tender in the payment of debts. The effect of settling the law so that parties can by contract protect themselves from the fluctuating intrinsic value of government paper, can scarcely be appreciated. I regard it fortunate that the question is to be decided in a time of peace, when it can be calmly considered, uninfluenced by any fear that a decision either way, may be disastrous to the government. The judgment appealed from should be affirmed.

Judgment of the special term reversed, and judgment directed for the plaintiff, adjudging the mortgage paid, and that it be satisfied of record.

[ERIE GENERAL TERM, May 7, 1866. *Davis, Grover, Marvin* and *Daniels,* Justices.]