IN THE MATTER OF THE ESTATE AND GUARDIANSHIP OF CHAR-
LOTTE A. LYNCH, AN INCOMPETENT PERSON.

[No. 12,890; decided August 1, 1894.]

**Incompetent Person—Allowance to Adult Son.**—It is competent for
the superior court sitting in probate to grant an allowance from the
estate of an incompetent person for the support of her adult son.

Petition for allowance to the adult son of an incompetent
person under guardianship.

Seth Mann, for the petitioners.

COFFEY, J. The facts set forth in the petitions of Eu-
gene J. Lynch and C. S. Benedict, the guardian of said
incompetent, are taken as proved. It is established that Eu-
gene J. Lynch is unable to support himself and is a poor
person without any property of his own; that he is the only
child of the incompetent, and is twenty-four years of age.
That he has always been supported by his mother, and it is
her present desire that he continue to be supported out of
the funds of her estate, which is ample to provide for her
support and for his also, the surplus of annual income after
providing for the incompetent being from $6,000 to $8,000.

The sole question presented is: Has the court authority to
make such an allowance under the laws of this state?

The general rule under which the obligation to support
arises is stated in section 206 of the Civil Code. "It is the
duty of the father, the mother, and the children of any poor
person who is unable to maintain himself by work to main-
tain such person to the extent of their ability. The promise
of an adult child to pay for necessaries previously furnished
to such parent is binding."

The powers and duties of guardians, so far as they are
concerned in this question, are defined by sections 1768 and
1770 of the Code of Civil Procedure as follows:

Section 1768: "Every guardian appointed under the pro-
visions of this chapter, whether for a minor or for any other
person, must pay all just debts due from the ward, out of
his personal estate, and the income of his real estate, if suffi-

cient; if not, then out of his real estate, upon obtaining an order for the sale thereof, and disposing of the same in the manner provided in this title for the sale of real estate of decedents.''

Section 1770: ''Every guardian must manage the estate of his ward frugally and without waste, and apply the income and profits thereof, as far as may be necessary, for the comfortable and suitable maintenance and support of the ward and his family, if there be any; and if such income and profits be insufficient for that purpose, the guardian may sell the real estate, upon obtaining an order of the court therefor, as provided, and must apply the proceeds of such sale, as far as may be necessary, for the maintenance and support of the ward and his family, if there be any.''

In the absence of statute and under the original practice when the estates of lunatics were under the jurisdiction of courts of equity, no question could arise as to the propriety of the allowance in the present case. The chancellor was guided by the natural justice of the circumstances and by what the lunatic himself would have done had he been of sound mind. Not only was support granted to his next of kin and those who had a right to look to him for support, but also out of the surplus income of his estate others were granted maintenance who had no legal claim upon him, if it satisfactorily appeared to the chancellor that the lunatic himself would have provided for the support of such persons had he been of sound mind: In re Willoughby, 11 Paige Ch. 257; In re Heeney, 2 Barb. Ch. 326.

(Adopted adults.) In these cases it usually appears that the lunatic has before the period of his incompetency assumed the duty of support toward the needy persons and by words or actions has indicated an intention to continue such support.

The case of Ex parte Whitbread, 2 Mer. 99, is frequently cited. In that case allowances were made to brothers and sisters upon the ground that the lunatic himself would have done so. To the same effect: In re Frost, L. R. 5 Ch. App. 699 (needy collateral relatives for whom the lunatic while sane had expressed an intention to make provision).

In Ex parte Haycock, 5 Russ. Ch. 154, an allowance was made for illegitimate children.

In these cases the question has always been whether an allowance may be properly granted to collateral kindred and persons whom the lunatic is not legally bound to support. It is .conceded without question that a needy adult child or person whom the lunatic is under obligation to support should be maintained out of the surplus income of the estate: See In re Willoughby, 11 Paige Ch. 257, Hambleton's Appeal, 102 Pa. 50, 55, and cases supra. In the absence of statute, therefore, it must be concluded that the allowance in the present case would be an eminently proper one, and far within the powers of the court.

Under the statutes, courts have evinced a disposition to be liberal in construction and to be guided as far as possible by equity rules.

The statute of Pennsylvania is similar to and perhaps more limited and stringent than our own. It provides that the committee of a lunatic "shall, from time to time, apply so much of the income thereof as shall be necessary, to the payment of his just debts and engagements, and the support and maintenance of such person and of his family; and for the education of his minor children": 2 Brightly's Purdon's Digest, p. 1128, par. 25.

Under this statute, in Hambleton's Appeal, 102 Pa. 50, 53, the facts were as follows: An old man, a widower and without children, having a large estate, took a nephew and his family to live with and take care of him and his estate, paying the nephew a salary, and supporting the nephew and his family as part of his household. Subsequently he became afflicted with senile dementia, though retaining sound physical health, and he was adjudged a lunatic. A committee of his estate was appointed by the court, and the nephew was appointed committee of the person. The latter fulfilled his duties satisfactorily, and, by order of court, received from the committee of the estate a sufficient monthly allowance to continue the household in the same manner as before the lunacy, and also to pay his salary as before. Upon the audit of his account, the auditor and the lower court surcharged him with one-half the cost of food for the household and the

wages of one servant. On appeal the supreme court held that the committee had done what it might reasonably be supposed the lunatic would have continued to do if he had retained his sanity, and what was apparently best adapted for the peace and comfort of the lunatic; and that it was, therefore, error to surcharge the committee with any cost of so maintaining the lunatic's household, including the committee and his family. In this case Gordon, J., in delivering the opinion, said:

"It was the duty of the court of common pleas to appropriate, in accordance with the directions of the act of assembly, so much of the income of the estate of William Neal, the lunatic, as might be sufficient, not only for his own support, but also for the support of his family, and as the income of his estate was ample, sufficient to meet any demand that might be reasonably made upon it, so should the allowance have been large enough to meet both his and their wants. Under such circumstances, it is not the business of the court to arbitrarily interfere and determine who shall constitute the lunatic's family, or what shall be its appointments, for, ordinarily these things have been previously fixed and settled by the lunatic himself at a time when he had both the power and ability to adjust his own affairs. . . . . .

"What, then, under the circumstances, was the duty of the court? We answer, simply to maintain and carry forward the affairs of William Neal as they were when his mind failed him; to do that which it might reasonably suppose he would have continued to do had he retained his sanity."

And he cites, with approval, the case of Ex parte Whitbread, 2 Mer. 99. Thus even under the statute the doctrine of the leading cases is invoked; that is, that the court will do what it may be reasonably supposed the lunatic would have continued to do had he retained his sanity.

In the present case it is plain that Mrs. Lynch would have continued to support her son as she always had done. She has constantly expressed her intention to do so. Before becoming incompetent and in her letter to Mr. C. S. Benedict, her guardian, which is only one of several of the same import, she requests that Eugene be allowed to want for nothing. Eugene is her only child, dependent upon her for sup-

port, and with herself constituting the family which she maintained and supported prior to her insanity.

The statute authorizes the continuance of this support by the guardian (Code Civ. Proc., sec. 1770), and enjoins it generally as a duty upon all persons: Civ. Code, sec. 206. It is to be presumed that Mrs. Lynch, if sane, would have performed this legal and moral duty; and the court under the doctrine of Hambleton's Appeal, supra, and Ex parte Whitbread, supra, will see that the duty is performed after her affliction has rendered her legally incompetent to perform it herself.

The provisions of the code are to be liberally construed with a view to effect its objects and to promote justice: Code Civ. Proc., sec. 4. Such a construction will hardly exclude a helpless son from the "*family*" of his mother: See Spencer v. Spencer, 11 Paige Ch. 160.

In Halsey's Appeal, 120 Pa. 209, it is said that the family of the lunatic should be supported although they consist of the mistress and illegitimate children of the lunatic. And in Elwyn's Appeal, 67 Pa. 367, 369, an allowance of $240 per annum was made for the support of a helpless sister of the lunatic whom he had always maintained, and although she was not a member of his family in the stricter sense, the allowance is recognized as a just and proper one. These decisions are all rendered under the statute above cited, which provides for the support of the "family" of the lunatic.

Family allowances in estates of decedents are specially restricted to minor children: Code Civ. Proc., sec. 1464. They are not so restricted in guardianship matters: Code Civ. Proc., sec. 1770. And the provisions concerning estates of decedents should not be imported into the special provisions concerning guardianship except so far as they relate to practice (Code Civ. Proc., sec. 1808), unless some particular provision is made to that effect: See Code Civ. Proc., sec. 1789.

Comfortable and suitable maintenance and support is provided for by the statute: Code Civ. Proc., sec. 1770. And where the estate is ample, the *comfort* of the ward should be the chief care of the guardian and of the court rather than the hoarding of the income for the heirs of the unfortunate: Hambleton's Appeal, 102 Pa. 50, 54.

Will the comfort of Mrs. Lynch be promoted if Eugene is deprived of the means of support she has always given him? If she should learn that he was in want, would it not tend to increase her malady? Her state of mind is clearly shown by the letter written by her to Mr. C. S. Benedict. Her comfort can be secured only by making this allowance to her son. If it is denied, the effect upon her mind and health may be very serious.

There is still another provision of our statute which enjoins the payment of an allowance for his support to Eugene Lynch. Section 1768, Code of Civil Procedure, provides that every guardian "must pay all just debts due from the ward." The words "debts due," like nearly all words, have both a general and special meaning, and are capable of a broad and liberal, or of a narrow and restricted, construction. The construction to be given these words must depend upon the context (Code Civ. Proc., sec. 16), bearing in mind the general rule of liberal construction: Code Civ. Proc., sec. 4.

In its restricted sense a debt due is a fixed sum of money owed upon contract; in its general sense it signifies something owed; all that is due a man under any form of obligation or promise: Bouvier's Law Dictionary. Coke says that debitum signifies not only a debt for which an action of debt lies, but generally any *duty* to be yielded or paid: Anderson's Law Dictionary, tit. "Debt." It is any kind of a just demand. One who is under obligation to discharge some *duty*, or to pay damages for its nonperformance, is a debtor, as really as one who is under obligation by bond to pay a sum of money: New Haven Sawmill Co. v. Fowler, 28 Conn. 108. See, also, Newell v. People, 7 N. Y. 124; Kimpton v. Bronson, 45 Barb. 625; Leggett v. Bank of Sing Sing, 24 N. Y. 290; Carver v. Braintree Mfg. Co., 2 Story, 432. See, also, Code of Civil Procedure, section 1643, where the phrase "debts of the estate" is made to include "all other *demands* against the estate." In section 1768, Code of Civil Procedure, the words "debts due" cannot be confined to mere contractual obligations, for then if the guardian's authority is to be measured by this section he could not discharge a claim for damages for the lunatic's tort, although the lunatic is civilly liable therefor: Civ. Code, sec. 41. The guardian's only statutory authority

to pay such a claim is contained in section 1768, Code of Civil Procedure. Therefore, construing these two sections together, we must conclude that the words "debts due" are to be given their broader and more liberal meaning.

Why may we not also construe section 206, Civil Code, and section 1768, Code of Civil Procedure, together? The former imposes a plain legal and moral duty, which has been the law of England since the reign of Queen Elizabeth: Schouler on Domestic Relations, sec. 237.

This duty of parent to a poor and helpless child is a debitum as "justly due" to the child as any obligation evidenced by indenture and seal.

Let us suppose a case: A weak and sickly child, blind, and utterly helpless, has lived to the age of majority under the fostering care of a wealthy mother. The child has no other relatives. She has been, with maternal care, placed in an institution at some distance from her mother's home, in the hope that she may be benefited by expensive medical treatment in a scientific environment. She is the sole heir apparent to her mother's large wealth. Her mother becomes insane. Do the laws of this state declare that this helpless person shall become a beggar, dependent upon public charity, and destined to mental torture perhaps worse than death? The legislature of this state could never have intended such a narrow and stringent construction of the words "debts due" and "family."

A liberal construction "with a view to effect its objects and promote justice," will never effect such an object nor promote such injustice.

In conclusion, a thorough search of the authorities has been made, but the decisions are few. All of the American and most of the English cases are herein cited, and no cases have been found which in the slightest degree weigh against the making of the allowance in question, all of the decisions being based upon or influenced by the liberal doctrine of equity.