CARUSI (REED v.). See Case No. 11,642.

---

## Case No. 2,485.

CARVER v. BRAINTREE MANUF'G CO.

[2 Story, 432; 2 Robb. Pat. Cas. 141; 10 Hunt, Mer. Mag. 470.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1843.

PATENTS — REISSUE —"COTTON GIN"—CONSTRUCTION—INTERPRETATION — QUESTION FOR JURY— MASSACHUSETTS MANUFACTURING CORPORATION ACT—"DEBTS CONTRACTED."

1. The patent act of 1836, c. 357, § 13 [5 Stat. 122], and the act of 1837, c. 45, § 8 [5 Stat. 193], authorizing the re-issue of a patent, because of a defective or redundant specification or description, without fraud or for the purpose of adding thereto an improvement, do not

[1] [Reported by William W. Story, Esq.. 10 Hunt, Mer. Mag. 470, contains only a partial report.]

require the patentee to claim, in his renewed patent, all things which were claimed in his original patent, but gives him the privilege of retaining whatever he deems proper.

[Cited in Wilson v. Rousseau, Case No. 17,-832; Crompton v. Belknap Mills, Id. 3,406; Chicago Fruit-House Co. v. Busch, Id. 2,-669; Parham v. American Button-Hole, O. & S. M. Co., Id. 10,713; Dorsey Harvester Rake Co. v. Marsh, Id. 4,014: Albright v. Celluloid Harness-Trimming Co., Id. 147; Gould v. Ballard, Id. 5,635; McWilliams Manuf'g Co. v. Blundell, 11 Fed. 420.]

2. Where the plaintiff, in a patent for "a new and useful improvement in the ribs of the cotton-gin," claimed, as a part of his invention, the increasing the space between the upper and lower surface of the rib, either by making the ribs thicker at that part, or by a fork, or by any other variation of the particular form; it was held, that the claim was sufficiently accurate as a matter of law, and that it was not necessary that he should describe all possible modes by which the rib might be varied, but only the most important, and that mere formal variations therefrom would be violations of the patent.

3. Objections, that a patented invention is old; or that the specification in a patent does not clearly describe the mode of making the machine; or that the original and the renewed patent are not for the same invention; or that either were obtained with a fraudulent intent: all involve matters of fact, and are for the jury, upon the evidence, to decide.

[Cited in Wilson v. Rousseau, Case No. 17,-832; Blanchard v. Putnam, 8 Wall. (75 U. S.) 426. Distinguished in Poppenhusen v. Falke, Case No. 11,279.]

4. Where the original patent was for "a new and useful improvement in the ribs of saw gins for ginning cotton," and the renewed patent was for "a new and useful invention in the manner of forming the ribs of saw gins for ginning cotton," and in the renewed patent was claimed, in addition to the thickness of the rib, the sloping up of it so as to leave no shoulder; it was held, that the claim in the renewed patent, was not for two distinct improvements, but for additional parts of the same improvement, and that the same thing was patented in both patents.

[Cited in Ex parte Ball, Case No. 810.]

5. Patents are to be interpreted by a consideration of the whole instrument, and it is to be thereby determined what thing is intended to be patented.

6. The statute of Massachusetts of 1821, c. 28, relating to the individual liabilities of members of manufacturing corporations, is to be construed as a remedial statute, and the phrase "debts contracted," as employed therein, means not only debts in the strict sense of the term, but any liabilities incurred by the corporation. If the liability be for unliquidated damages arising from contract or tort, it relates to the time of its origin, and not of its liquidation; and, therefore, it was held, that the testimony of Edson, who was a member of the corporation at the time when the liability asserted in the present suit arose, must be rejected, although he had since sold out all his interest.

[Cited in Re Sutherland, Case No. 13,639; Cuykendall v. Miles, 10 Fed. 345; Re Boston & Fairhaven Iron-Works, 29 Fed. 786. Applied in Chase v. Curtis, 113 U. S. 463, 5 Sup. Ct. 559. Distinguished in Powell v. Oregonian Ry. Co., 36 Fed. 728.]

Case [by Eleazer Carver against the Braintree Manufacturing Company] for infringement of a patent, dated the 16th of November, 1839 [and numbered 17], for "a new and

useful improvement in the ribs of the cotton gin." The present patent was a renewed patent, granted upon the surrender of the original patent [No. 777], dated the 12th of June, 1838, which was cancelled on account of a defective specification. The specification annexed to the original patent was as follows: "To all whom it may concern: Be it know that I, Eleazer Carver, of Bridgewater, in the county of Plymouth, and state of Massachusetts, have invented a certain improvement in the manner of forming the ribs of saw gins, for the ginning of cotton, and I do hereby declare, that the following is a full and exact description thereof: In the cotton gin, as heretofore known and used, the. fibers of the cotton are drawn by the teeth of circular saws through a grating formed of a number of parallel bars or ribs, having spaces between them sufficient to allow the saws to pass, carrying the fibres of the cotton with them (which are then brushed off by a revolving brush), but not wide enough to let the seeds and other foreign substances pass through. Above the saws, the ribs come in close contact, thus forming a shoulder at the top of the space between them. Various forms have been given to the bars or ribs, with a view to procure a free passage for the cotton, but the cotton-gin, as heretofore made, has been always subject to the inconvenience of the grate becoming choked by hard masses of cotton, and motes, or false seeds, collecting in the upper part of the spaces between the ribs, and impeding the action of the saws, and also preventing the mass of cotton, which is drawn by the saws up to the top of the spaces, but not drawn through them, from rolling back freely, so as to pass again over the saws, as it should do. My improvement, which I am about to describe, is intended to obviate these difficulties, and it consists in giving a new form to the ribs composing the grate. Instead of making the ribs of a bar of iron of equal thickness throughout, so that the upper and under surfaces shall be parallel, I so form the rib that at the part where the saws pass through, carrying the cotton with them, the space or depth between the upper or outer surface, and the lower or inner surface, shall be greater than the thickness of the rib in other parts has heretofore been, or needs to be, and so great as to be equal to the length of the fibre of the cotton to be ginned, so that the fibre shall be kept extended between the ribs for about its full length, while it is drawn through them by the saws. This will, of course, require either that the rib should be as thick at that part as the length of the fibre, or that the rib should be forked or divided about that part, so that the upper or outer surface and the under or inner surface shall diverge to that distance from each other, instead of being parallel, as formerly, when the rib was made of one bar of uniform thickness. This under or inner surface then takes a new direction upwards,

and slopes toward the upper or outward surface. until the two surfaces meet above the periphery of the saw. This last described part of the under surface is fastened against the frame-work of the gin. The operation of this improvement is, that those fibres of the cotton, which are so firmly caught by the teeth of the saws as to be disengaged from the mass of the cotton to be ginned, are drawn out to their full length, and pass clear through the grate, and are then brushed off by the revolving brush, while the fibres that are drawn into the grate, but are not caught by the teeth of the saws firmly enough to be carried quite through, are disengaged, and pass up to the point, where the under surface meets the upper surface above the saws, and finding no obstruction there, pass back out of the grate without choking it, and roll down again with the mass of the unginned cotton, and are then caught below by the saws and carried up again, and so on, until all the fibres are drawn through. Having thus described my improved rib, and its advantages, I now claim as my invention, and desire to secure by letters patent, the increasing the depth or space between the upper or outer surface of the rib and the lower or inner surface of it, at the part where the cotton is drawn through the grate, so that it shall be equal to the length of the fibre of the cotton to be ginned (whether this be done by making the ribs thicker at that part, or by a fork or division of the rib, or by any other variation of the particular form), and I also claim, as part of the same improvement, the sloping up of the lower or inner surface of the rib, so as to meet the upper or outer surface above the saws, leaving, when the rib is inserted into the frame, no break or shoulder between the two surfaces, but a smooth and uninterrupted passage upwards between the ribs as above described." The defendant pleaded the general issue, and also filed special matters of defence.

Willard Phillips and Fletcher, for the defendants, at the trial made several points of defence, which, however, are sufficiently referred to in the opinion of the court.

Franklin Dexter, for the plaintiff, denied the validity of all the objections. As the matters of objection were afterwards fully considered in the arguments for a new trial, they are here also admitted.

At the trial, one Edson, who was a member of the corporation (the defendants) at the time of the supposed infringement, but had since sold out his interest, was offered as a witness for the corporation. But upon an objection by the plaintiff, his testimony was rejected, as being inadmissible, as he still had an interest in the event of the suit. THE COURT, however, ruled out the testimony, hesitanter, expressing a desire to re-examine it, if the verdict should be for the plaintiff.

A great deal of evidence was introduced on each side; but the questions on which the

cause seemed principally to rest, were questions of law, and were accordingly argued by the counsel in the course of the trial.

STORY, Circuit Justice, upon the close of the arguments, said: So far as the questions of fact are concerned, I shall leave them for the consideration of the jury, if upon the whole evidence the counsel desire it. But the questions of law are those upon which I am ready to express my present opinion, subject to re-examination, if the counsel shall wish any of them to be more deliberately considered. The first objection is, that the specification has not sufficiently described the mode of making the improvement, or in such full, clear, and exact terms as to enable a skilful mechanic, skilled in the art or science to which it appertains, or with which it is most nearly connected, to make or construct it. This is certainly a matter mainly of fact. It is true, that the plaintiff, in his specification, in describing the thickness of the rib in his machine, declares, that it should be so thick, that the distance or depth between the upper and the lower surface should be "so great as to be equal to the length of the fibre to be ginned," which, it is said, is too ambiguous and indefinite a description to enable a mechanic to make it, because it is notorious, that not only the fibres of different kinds of cotton are of different lengths, long staple, and short staple; but that the different fibres in the same kind of cotton are of unequal lengths. And it is asked, what then is to be the distance or depth or thickness of the rib? Whether a skilful mechanic could from this description make a proper rib for any particular kind of cotton, is a matter of fact, which those only, who are acquainted with the structure of cotton gins, can properly answer. If they could, then the description is sufficient, although it may require some niceties in adjusting the different thicknesses to the different kinds of cotton. If they could not, then the specification is obviously defective. But I should suppose, that the inequalities of the different fibres of the same kind of cotton would not necessarily present an insurmountable difficulty. It may be, that the adjustment should be made, according to the average length of the fibres, or varied in some other way. But this is for a practical mechanic to say, and not for the court. What I mean, therefore, to say on this point is, that, as a matter of law, I cannot say, that this description is so ambiguous, that the patent is upon its face void. It may be less perfect and complete, than would be desirable; but still it may be sufficient to enable a skilful mechanic to attain the end. In point of fact, is it not actually attained by the mechanics employed by Carver, without the application of any new inventive power, or experiments? If so, then the objection could be answered as a matter of fact or a practical result.

The next objection is, that the patentee has omitted some things in his renewed patent, which he claimed in his original patent as a part of his invention, viz., the knob, the ridge, and the flaring of the lateral surface of the rib above the saw, and that he claims in his renewed patent the combination of the thickness and the slope of the front and back surfaces of the rib. Now, by the thirteenth section of the patent act of 1836, c. 357, it is provided, that whenever any patent, which is granted "shall be inoperative or invalid by reason of a defective or insufficient description, or specification, or by reason of the patentee claiming in his specification as his own invention more than he had or shall have a right to claim as new, if the error has or shall have arisen by inadvertency, mistake, or accident, and without any fraudulent or deceptive intention, it shall be lawful for the commissioner, upon the surrender to him of such patent, and the payment of the further sum of fifteen dollars, to cause a new patent to be issued to the inventor for the same invention, for the residue of the period then unexpired for which the original patent was granted in accordance with the patentee's corrected description and specification." And it is afterwards added, that "whenever the original patentee shall be desirous of adding the description of any new improvement of the original invention or discovery, which shall have been invented or discovered by him subsequent to the date of his patent, he may, like proceedings being had in all respects as in the case of original applications, and on the payment of fifteen dollars, as hereinbefore provided, have the same annexed to the original description and specification." The act of 1837, c. 45, § 8, further provides, "that whenever any application shall be made to the commissioner for any addition, or a newly discovered improvement, to be made to an existing patent, or whenever a patent shall be returned for correction and reissue, the specification annexed to every such patent shall be subject to revision and restriction, in the same manner as original applications for patents; the commissioner shall not add any such improvement to the patent in the one case, nor grant the reissue in the other case, until the applicant shall have entered a disclaimer, or altered his specification of claim, in accordance with the decision of the commissioner." See Act 1836, c. 357, § 7.

Now, I see nothing in these provisions which upon a reissue of a patent requires the patentee to claim all things in the renewed patent, which were claimed as his original invention, or part of his invention in his original patent. On the contrary, if his original patent claimed too much, or if the commissioner deemed it right to restrict the specification, and the patentee acquiesced therein, it seems to be, that, in each case, the renewed patent, if it claimed less than the original, would be equally valid. A speci-

fication may be defective and unmaintainable under the patent act. as well by an excess of cl...n, as by a defect in the mode of stating it. How can the court in this case judicially know, whether the patentee left out the knob, and ridge, and flaring of the lateral surface of the rib, in the renewed patent, because he thought, that they might have a tendency to mislead the public by introducing what, upon further reflection, he deemed immaterial or unessential, and that the patent would thus contain more than was necessary to produce the described effect, and be open to an objection, which might be fatal to his right, if it was done to deceive the public? Act 1836, c. 357, § 15. Or, how can the court judicially know, that the commissioner did not positively require this very omission? It is certain, that he might have given it his sanction. But I incline very strongly to hold a much broader opinion; and that is, that an inventor is always at liberty in a renewed patent to omit a part of his original invention, if he deems it expedient, and to retain that part only of his original invention, which he deems it fit to retain. No harm is done to the public by giving up a part of what he has actually invented; for the public may then use it; and there is nothing in the policy or terms of the patent act, which prohibits such a restriction. The other part of the objection seems to me equally untenable. If the description of the combination of the thickness and the slope of the front and back surfaces of the rib, were a part of the plaintiff's original invention, (as the objection itself supposes,) and were not fully stated in the original specification, that is exactly such a defect as the patent acts allow to be remedied. A specification may be defective, not only in omitting to give a full description of the mode of constructing a machine, but also in omitting to describe fully in the claim the nature, and extent, and character of the invention itself. Indeed, this latter is the common defect, for which most renewed patents are granted.

Another objection is, that the plaintiff, in his claim, has stated that the desired distance or space between the upper and the lower surfaces of the rib, whether it "be done by making the ribs thicker at that part, or by a fork or division of the rib, or by any other variation of the particular form," is a part of his invention. It is said that the modes of forking and dividing are not specified, nor the variations of the particular form given. This is true; but then the patent act requires the patentee to specify the several modes, "in which he has contemplated the application of the distinguishing principle or character of his invention." Act 1836, c. 357, § 6. Now, we all know that a mere difference of form will not entitle a party to a patent. What the patentee here says in effect is: One important part of my invention consists in the space or distance between the upper and lower sur-

faces of the ribs, and whether this is obtained by making the rib solid, or by a fork, or division of the rib, or by any other variation of the form of the rib, I equally claim it as my invention. The end to be obtained is the space or distance equal to the fibre of the cotton to be ginned; and you may make the rib solid, or fork it, or divide it, or vary its form in any other manner, so as that the purpose is obtained. The patentee, therefore, guards himself against the suggestion, that his invention consists solely in a particular form, solid, or forked, or divided; and claims the invention to be his, whether the exact form is preserved, or not, if its proportions are kept so as to be adapted to the fibre of the cotton which is to be ginned. In all this I can perceive no want of accuracy or sufficiency of description, at least so far as it is a matter of law, nor any claim, broader than the invention, which is either so vague or so comprehensive, as, in point of law, not to be patentable. It was not incumbent upon the patentee to suggest all the possible modes by which the rib might be varied, and yet the effect be produced. It is sufficient for him to state the modes which he contemplates to be best, and to add, that other mere formal variations from these modes he does not deem to be unprotected by his patent.

Another objection is, that the patentee has not sufficiently described the slopes between his ribs, so as to make the description intelligible, or to enable a skilful mechanic to construct them. Whether this be so, or not, is not a matter of law upon the face of the patent, but a matter of fact for the jury, if there be any serious doubt about it.

Some other objections have been taken, such as, that the invention is not new, that the original patent and the renewed patent are not identical for the same invention. and that the patent was obtained with a fraudulent intent, for the purpose of covering the invention of Copeland, which has been patented and sustained in this court against the claim of the plaintiff. But these all involve matters of fact, which belong to the province of the jury, upon the evidence, with which I do not intermeddle, and upon which the parties are at liberty to take the opinion of the jury.

I have thus stated summarily, according to the suggestions of the counsel for the defendants, my own views of the patent, and of the objections taken thereto. I have stated them in my own language, and with a view to make my own meaning clear. I cannot admit that I am bound to respond to the very terms in which the objections are taken, or to give instruction to the jury, affirming or denying them. without qualification or explanation. If the counsel for the defendants wish for a more deliberate examination of the points of law, after the trial is over, they can be brought again before this court, upon a motion for a new trial;

or, if a verdict is given to the plaintiff to an amount which will justify an appeal, the opinion of the supreme court may be taken upon the matters of law.

Upon these statements of the court, the defendants' counsel elected not to go to the jury, and a verdict was by consent taken for the plaintiff, for $960.50, subject to the opinion of the court upon the matters of law; and also to the ruling of the court as to the inadmissibility of one Edson, who was at the time of the supposed infringement, a member of the corporation, and had since sold out his interest; and whom the court rejected as a witness for the corporation.

In the trial of this case the following rulings were excepted to by the defendants: The defendants understand the following points to have been ruled by the court, viz., "That the describing and claiming the increasing of the distance from where the cotton goes in, to where it comes out from between the grates, to be equal to the length of the fibres of cotton to be ginned, is a sufficiently accurate, specific, and definite description and claim. That the patentee had a right to drop the things patented in his original patent, viz. the knob, the ridge, and the flaring of the lateral surface of the rib above the saw, and patent in his renewal, the combination of the thickness and the slope of the front and back surfaces of the rib. That the claiming of the increasing of the distance from where the cotton enters to where it comes out from between the ribs, by forking, division, or any variation of the particular form, is not claiming too much. That the patentee had a right to claim, and patent, the knob or projection F, in his renewal, of the same width as the rib, notwithstanding he had described and patented the same in his original as narrower than the rib. That the patentee was not bound to specify the modes of forking and division, and variations of the particular form claimed and patented by him. That the original was invalid and inoperative, within the provisions of the patent law for a renewal. That the patentee, by specifying the distance, which the cotton is carried between the ribs, and not claiming the same, as an element of his patent, did not thereby abandon the same. That the patentee, by distance, which the cotton was so carried to be equal to the 'full' length of the fibre in the original, was not thereby precluded from claiming and patenting that distance, caused by thickness of the rib or otherwise, equal to the average length of the fibres on one seed, in his renewal. That the patent describes, and claims with sufficient clearness, and exactness, a slope between the ribs. That the specification states sufficient elements for a patent for a combination, and adequately specifies, points out, and claims a combination. That John Edson was interested in the event of the suit, and by reason of such interest was incompetent as a witness. It was, as the counsel for the defendants understood the case, established by the testimony and not disputed, that the thickness of the grate, or distance that the cotton passed between the grates, and the obliquity or slope of the shoulder, as specified by the plaintiff, were neither of them new."

Phillips and Fletcher, for defendant, now moved for a new trial.

Franklin Dexter, for plaintiff.

STORY, Circuit Justice. To many of the objections stated in the motion for a new trial, to the supposed rulings of the court, a very brief answer may be given. In the first place, I cannot admit that they are in terms the actual rulings of the court, upon the points in controversy at the trial; and since they have been furnished to me, I have drawn out at large the views, which I then suggested upon the points in controversy at the trial; so that my actual meaning should be accurately understood. Upon further reflection, I do not feel it necessary to add to the views there suggested. They were as follows: (Here the judge recapitulated the remarks already cited as made at the trial.) I see no reason to be dissatisfied with what was then said; and if the observations then made were correct, it seems to me that they dispose of the principal objections, at least, so far as my own judgment is concerned. They might be elaborated, but they contain the substance of all that I desire to say on these points.

One point is, however, now brought out upon the argument for a new trial, which was not so fully suggested at the trial, and, indeed, which arose so incidentally, that it was scarcely a matter calling for any very positive expression of the opinion of the court. It is now said, that the plaintiff's claim is, in fact, for a new combination of a rib of a particular thickness, with the particular sloping up of his rib, as described in the specification; and that it is not the thing which is patented. It appears to me, that there is more of refinement in the form of this objection, than there is of difficulty in resolving it. The renewed patent is, in terms, a patent for "a new and useful improvement in the ribs of saw gins for ginning cotton." The original patent is substantially like it in the descriptive words. It is for "a new and useful improvement in the manner of forming the ribs of saw gins for ginning cotton." The language of the specification annexed to the renewed patent is, for "an improvement in the manner of forming the ribs of saw gins for ginning cotton." So that in substance we may clearly see, that the same improvement is designed to be included in the descriptive words. In the summing up of his claim in this last specification the patentee says: "I now claim as my invention, and desire to secure by letters patent, the increasing the depth or space between the upper or outer surface of the rib, and the lower or inner surface of it, at

the part where the cotton is drawn through the grate, so that it shall be equal to the length of the fibre of the cotton to be ginned (whether this is done by making the ribs thicker in that part, or by a fork, or division, or by any other variation of the particular form); and I also claim as a part of the same improvement the sloping up of the lower or inner surface of the rib, so as to meet the upper or outer surface above the saws, leaving, when the rib is inserted into the frame, no break, or shoulder between the two surfaces, but a smooth and uninterrupted passage upwards between the ribs, as above described." The drawings annexed to the specification are designed to make the description more palpable and clear. And it is not without significance in the case to remark that, as the patent is for an improvement upon the common cotton-gins, it presupposes, on the part of those interested in the matter, a full knowledge of the machinery and structure of the common gins. Now, to me it is perfectly clear, that the present patent is founded upon a claim for one entire thing, that is, for an improved rib, or a specified improvement upon the common rib of cotton-gins. It is not a claim for two distinct and independent improvements, each susceptible of a distinct operation, or each claimed as a distinct invention; but both are claimed as parts and parcels of the same improvement, and necessary thereto. I do not say, whether each of the specified things, going to make up the entire improvement, might not have been separately claimed as several inventions. That is not a necessary point in the present case. What I mean to say is, that they are not so summed up in the claim; but they are summed up as making an entirety. They go to make up the improved rib, which is patented. That rib is the thing claimed, and not the thickness or depth or space of the rib alone, or the sloping up of the surfaces thereof alone. Both are claimed as parts of the same improvement, but neither alone as constituting it. I see no objection to its being called a combination of particular forms and arrangements of structure to complete the improved rib. In a just sense, that is a combination which requires different things or different contrivances or different arrangements to be brought together, to accomplish the given end. But it is far from following from this, that the combination is not and may not be treated as an entirety.

There is no magic in words; and above all, in patents, the court looks through the whole patent and specification, in order to ascertain what the thing claimed and patented is; whether it is for an entirety, or for various distinct improvements, capable of a distinct operation, and independent use in the same machine, or for both; or whether it is for a combination of two or more things in a particular machine, to produce a given result, or for a simple or single improvement in a par-

ticular machine; or whether it is for any one or more of them. There is no artificial or universal rule of interpretation of such instrument beyond that which common sense furnishes, which is to construe the instrument as a whole, and to extract from the descriptive words and the claim, what the invention is, which is intended to be patented. and how far it is capable of exact ascertainment, and how far it is maintainable in point of law, supposing it clear from all ambiguity. Now, looking at the present patent, it seems to me impossible to entertain any real doubt as to its true interpretation. It is. as the words of the claim state it to be, for a single thing—"an improved rib." The improvement is upon the existing rib in the cotton gin, and consists in two things, neither of which (as has been already suggested) is claimed separately, but both together, as constituting one conjoint improvement. It appears to me. that the claim sufficiently expresses the real nature, extent, and character of the improvement, and is in perfect compliance with the sixth section of the patent act of 1836, c. 357. I should not have thought it necessary to consider this objection so far, if it had not been for the zeal and ingenuity, with which it has been pressed upon the court. Call the improvement an entirety, or a combination, as we may please, it is still a patent for "an improved rib," and nothing more.

The remaining objection is to the rejection of the testimony of Edson. And here it is, that I have entertained some doubt. upon which I was desirous of hearing the further argument. which has now been had. The defendants were created a corporation by the statute of Massachusetts of the 14th of June, 1823, and were, of course, made subject to all the liabilities and requirements of the general statute of 1821. c. 28 [Laws Mass. 600]. respecting the liabilities of manufacturing corporations. That statute provides "that every person, who shall become a member of any manufacturing corporation which may be hereafter established in this commonwealth, shall be liable in his individual capacity for all debts contracted during the time of his continuing a member of such corporation." The question turns, therefore, upon the meaning of the words "debts contracted," in the statute. Do they mean literally and strictly such debts as are due and payable in money, ex contractu, by the positive or implied engagements of the corporation. and resolve themselves into liquidated or determinate sums of money, due as debts (see 2 Bl. Comm. 464; 3 Bl. Comm. 154). or do they extend to all legal liabilities incurred by the corporation, and which, when fixed by a judgment, or award. or otherwise, are debts of the corporation? And if the latter be the true meaning, then, does the statute liability exist only from the time when it becomes an ascertained debt of the corporation. or does it relate back to the origin of the liability, and bind the corporators from that time?

If the words "debts contracted," in the statute, are to receive the limited construction, that they are applicable only to debts in the strict sense of the term, that is, contracts of the party for the payment of money, and nothing else, it is obvious, that the purposes of the statute, which although, in some sense, it may be deemed penal, is also in another sense remedial, would be comparatively of little value. Suppose the case of a contract by the corporation to do work, or to manufacture goods of a particular quality or character, or to furnish materials, or to buy cotton or wool undelivered, or to build houses, or to employ workmen; and the contract should be entirely unperformed, and broken, and refused to be performed, so that the right of the other party would be, not to money, but to unliquidated damages for the non-performance or refusal to perform; if these, which are by no means uncommon contracts, should be without the purview of the statute, it would have a very narrow and inadequate range and operation. Yet such cases sound merely in damages. Suppose a manufacturing corporation to obstruct its neighbor's mill-privilege, or stop his mill works, by back flowage, if such acts be not within the protection of the statute, we see, at once, that an insolvent corporation might do irreparable mischief without any just redress to the other party. Suppose such an insolvent corporation should unlawfully, under an unfounded claim of right, convert 100 or 1000 bales of cotton belonging to a third person, we see, that the mischief could be redressed only by an action of trover for unliquidated damages; and if the individual corporators were not liable therefor, after an unsatisfied judgment, the statute would be little more than a delusion. If, on the other hand, we should construe the statute broadly as a remedial statute, and give to the word "debts," a meaning, not unusual, as equivalent to "dues," and to the word "contracted," a meaning, which, though more remote, is still legitimate, as equivalent to "incurred," so that the phrase, "debts contracted," in this sense would be equivalent to "dues owing," or "liabilities incurred," the statute would attain all the objects for which it seems designed. The supreme court of Massachusetts, in Mill Dam Foundery v. Hovey, 21 Pick. 455, held, under the statute of 1829, c. 53, § 6 [3 Metc. Laws Mass. 297], which makes the stockholders liable for the debts of the corporation, that the term "debts" included a claim for unliquidated damages. That was a case arising ex contractu; but the language certainly extends the term "debts" beyond its close and literal meaning. And if it covers cases of unliquidated damages, ex contractu, it is difficult to say, why it should stop there, and not go further and cover cases of unliquidated damages arising from torts to property. In each case there is no debt until the damages are ascertained and liqui-

dated; and then the debt seems to relate back to its origin. Blackstone says, "A debt of record is a sum which appears to be due by the evidence of a court of record; thus, when any specific sum is adjudged to be due from the defendant to the plaintiff in an action or suit at law, this is a contract of the highest nature, being established by the sentence of a court of judicature." 2 Bl. Comm. 464; 3 Bl. Comm. 160. Here Blackstone manifestly included all sorts of actions or suits, where the judgment is for a sum certain, whatever may be its nature or origin. 2 Bl. Comm. 464; 3 Bl. Comm. 160, 161; Com. Dig. "Debt," A. 2.

I agree that it is no part of the duty or functions of courts of justice, to supply the deficiencies of legislation, or to correct mischiefs which they have left unprovided for. That is not the question here. But the question is, whether, if the words of a statute admit of two interpretations, one of which makes the legislation incomplete for its apparent object, and the other of which will cover and redress all the mischiefs, that should be adopted, in a statute confessedly remedial, which is the most narrow, rather than that which is the most comprehensive, for the reason only, that the latter will create an obligation or duty, beyond what is imposed by the common law? It seems clear, that in common parlance, as well as in law, the term is in an enlarged sense sometimes used to denote any kind of a just demand. See Com. v. Keeper of Philadelphia Jail, 4 Serg. & R. 506; Gray v. Bennett, 3 Metc. [Mass.] 522, 526. And in the Roman law it had sometimes the like enlarged signification. "Sed utrum ex delicto an ex contractu debitor sit, nihil refert," says the Digest. Dig. lib. 5, tit. 3, 1. 14; Pothier, Pand. lib. 50, tit. 16, note 69. Upon this subject I confess that with all the lights which have been thrown upon the question by the able arguments at the bar, I am not without some lurking doubts. But having reflected much upon the subject, and being in the same predicament, which Lord Eldon is said to have suggested as having sometimes occurred to himself, that he felt doubts, but was unable to solve them to his own entire satisfaction. I have at length come to the conclusion that the rejection of the witness as an interested witness was right. I follow out the doctrine of the case of Mill Dam Foundery v. Hovey, 21 Pick. 455, which, as far as it goes, disclaims the interpretation of the word, "debt" as limited to contracts for the payment of determinate sums of money. Passing that line, it does not seem to me easy to say, that if cases of unliquidated damages may be treated as debts, because they end in the ascertainment of a fixed sum of money, that we are at liberty to say, that the doctrine is not equally applicable to all cases of unliquidated damages, whether arising ex contractu or ex delicto. If ultimately it ends in a debt,

as a judgment for damages does, that case asserts, that its character as a debt relates back to its origin. Besides, it seems to me upon principle to ʻbe reasonable, if not absolutely justified by authority, to hold, that if the transaction occurs while a person is a member of the corporation, and he would, if he remained a member, be liable for the ultimate debt adjudged, it may well be treated as an inchoate debt consummated by the judgment. Since the argument was had, my attention has been called to the case of Gray v. Bennett, 3 Metc. [Mass.] 522, 530, 531, which, in several respects, confirms the reasoning, which I had previously adopted, in relation to the meaning of the word "debt," and the construction which it ought to receive in a remedial statute. If I had seen that case at an earlier period, it would have somewhat abridged my own researches on the same subject. The result is, that the motion for a new trial is over-ruled, and judgment must pass for the plaintiff.

[NOTE. For another case involving this patent, see Carver v. Hyde, 16 Pet. (41 U. S.) 513.]