[No. 12697.  Department Two.  November 22, 1915.]

AMY D. BRONSON, *an Infant, by her Guardian Ad Litem etc.*,
*Respondent*, v. HARRY SYVERSON, *Appellant*.[1]

CONSTITUTIONAL LAW — RULES OF CONSTRUCTION.  Constitutional
provisions having a general and a restricted meaning must be taken
in their general or ordinary sense.

SAME—PERSONAL LIBERTY—IMPRISONMENT FOR DEBT—"DEBT."  A
judgment in an action for tort is a "debt," within Const., art. 1, § 17,
providing that there shall be no imprisonment for debt except in
case of absconding debtors.

SAME.  Punitive damages not being recoverable in this state,
arrest under a judgment in a civil action for tort cannot be justified
as a vindication or as punishment for the wrong done.

SAME.  Rem. & Bal. Code, § 749, authorizing the arrest and im-
prisonment of a judgment debtor upon execution against his person
in certain civil actions not arising out of contract, violates Const.,
art. 1, § 17, providing that there shall be no imprisonment for debt
except in case of absconding debtors.

Appeal from an order of the superior court for Lewis
county, Edward H. Wright, J., entered November 21, 1914,
directing a writ of execution against the person of a judg-
ment debtor.  Reversed.

*Hayden, Langhorne & Metzger* and *Thacker & Hancock*,
for appellant.

*G. E. Hamaker*, for respondent.

FULLERTON, J.—The respondent, Amy D. Bronson, an
infant, by her guardian, brought an action against the ap-
pellant, Harry Syverson, to recover for her seduction, stating
her damages at $20,000.  An answer was filed by Syverson,
traversing the allegation of the complaint, and setting up
affirmatively facts which were thought to show want of ca-
pacity in the plaintiff to sue.  The affirmative matter was de-
nied by a reply, and the cause, being thus at issue, was set for
trial by the court on a day certain.  On the day appointed for

[1] Reported in 152 Pac. 1039.

the trial, the plaintiff appeared in person and by her counsel and announced herself ready for trial. The defendant did not appear, either in person or by his counsel, and on his counsel being called, they announced that the defendant would not further appear in the action. The court thereupon caused a jury to be empaneled, heard the evidence of the plaintiff, and submitted the cause to the jury under instructions deemed applicable thereto. The jury returned a verdict in the usual form, finding for the plaintiff and assessing her damages at $20,000. The court, upon the same day, entered a judgment upon the verdict, to the effect that the plaintiff have and recover from the defendant the amount returned by the jury, together with her costs and disbursements. An execution was issued upon the judgment against the property of the defendant and placed in the hands of the sheriff, who returned it wholly unsatisfied.

After the return of the writ, the plaintiff applied to the court, by petition, for an amendment of the judgment, averring in the petition that the cause of action was one under which the defendant could have been arrested in virtue of the statute, and prayed that the judgment be amended by adding thereto a clause permitting the arrest of the defendant. The petition was heard without service upon or notice to the defendant, at the conclusion of which the court made the following order:

"It is therefore ordered, adjudged and decreed, that there be added to the terms of the judgment entered herein, on the 24th day of October, 1913, without otherwise in any way interfering with, changing or modifying the terms or the meaning of said judgment, the following words, and figures, to-wit:

" 'That the clerk of this court is hereby ordered and directed to issue an execution against the person of the defendant and that the sheriff of Lewis county, Washington or the sheriff of any other county in the state of Washington, where the defendant may be found shall be and is hereby required to arrest the defendant and place him in the county jail and hold him there until said judgment is paid and satisfied or until he shall be discharged according to law.'

and it is further ordered that upon the filing and entering of
this order the clerk immediately issue an execution against
the person of the said defendant, Harry Syverson, directed to
the sheriff of Lewis county, Washington, or to any other sher-
iff of any other county of the state of Washington, where the
defendant may be found, ordering the said sheriff to whom
said execution shall be issued, to forthwith arrest the said de-
fendant Harry Syverson and commit him to the county jail of
Lewis county, Washington, until he shall pay such judgment
or thence be discharged according to law."

Immediately on the entry of the order, the clerk issued an
execution thereon against the person of the defendant, on
which the sheriff arrested the defendant and confined him to
the jail of Lewis county. After his arrest, the defendant
moved for his discharge, basing his motion on a number of
grounds. The motion was overruled and an order entered
accordingly. From this order, the defendant appeals.

Among the grounds assigned in the motion for the dis-
charge of the defendant was the ground that he was being
imprisoned for debt, in violation of art. 1, § 17, of the con-
stitution, which provides, "There shall be no imprisonment
for debt except in case of absconding debtors." Our con-
clusion on this branch of the motion precludes the necessity
of discussing the others.

The provision of the statute thought to justify the arrest
of the defendant is found at § 749 of Rem. & Bal. Code, and
reads as follows:

"The defendant may be arrested in the following cases:—

"(1)    In an action for the recovery of damages, on a
cause of action not arising out of contract, where the defend-
ant is a nonresident of the state, or is about to remove there-
from, or where the action is for an injury to person or char-
acter, or for injuring, or for wrongfully taking, detaining,
or converting property;

"(2)    In an action for a fine or penalty, or on a promise
to marry, or for money received, or property embezzled, or
fraudulently misapplied, or converted to his own use, by a
public officer, or by an attorney, or by an officer or agent

of a corporation in the course of his employment as such, or by any factor, agent, broker, or other person in a fiduciary capacity, or for any misconduct or neglect in office or in a professional employment;

"(3)   In an action to recover the possession of personal property unjustly detained, when the property, or any part thereof, has been concealed, removed or disposed of, so that it cannot be found or taken by the sheriff, and with intent that it should not be so found or taken, or with the intent to deprive the plaintiff of the benefit thereof;

"(4)   When the defendant has been guilty of a fraud in contracting the debt, or incurring the obligation for which the action is brought, or in concealing or disposing of the property, for the taking, detention or conversion of which the action is brought;

"(5)   When the defendant has removed or disposed of his property, or is about to do so, with intent to defraud his creditors;

"(6)   When the action is to prevent threatened injury to or destruction of property, in which the party bringing the action has some right, interest, or title, which will be impaired or destroyed by such injury or destruction, and the danger is imminent that such property will be destroyed or its value impaired, to the injury of the plaintiff;

"(7)   On the final judgment or order of any court in this state, while the same remains in force, when the defendant, having no property subject to execution, or not sufficient to satisfy such judgment, has money which he ought to apply in payment upon such judgment, which he refuses to apply, with intent to defraud the plaintiff, or when he refuses to comply with a legal order of the court, with intent to defraud the plaintiff; or when any one or more of the causes exist for which an arrest is allowed in the first class of cases mentioned in this section."

Historically, this section of the statute, although in a somewhat different form, was first enacted into law by the territorial legislature of 1854 (Laws 1854, p. 145); it was reenacted in its original form in 1860 (Laws 1860, p. 17), and again in 1863 (Laws 1863, p. 100). In 1868, the territorial legislature authorized the governor of the territory to appoint "three discreet persons as code commission-

ers," to revise, digest and codify the statute laws of the
territory, empowering the commission when appointed to thor-
oughly revise such laws, classify and arrange them under ap-
propriate titles, reject all repealed and obsolete statutes, and
"make and incorporate into the civil, criminal, probate and
justice's practice acts, such amendments as they or a major-
ity of them deem advisable;" requiring the commission to re-
port the result of the labors to the next session of the legis-
lature (Laws 1868, p. 64). The commission appointed pur-
suant to the act reported a number of bills, among which was
one entitled, "An act to regulate the practice and proceed-
ings in civil actions." The bill was enacted into law by the
legislature of 1869, in the form and under the title reported
by the commission. In this act the statute in question ap-
pears in the laws in its present form for the first time. Laws
1869, p. 28, § 114. It was again reenacted in the codi-
fication of 1873 (Laws 1873, p. 30); again in 1877 (Laws
1877, p. 24); and finally again in the codification of 1881
(Code of 1881, p. 53). Since 1869, there has been no change
in its phraseology, and, if not repugnant to art. 1, § 17 of
the constitution, remained in force as a part of the state
statutes, in virtue of art. 27, § 2, of that instrument. Since
statehood the codification of the laws have been unofficial in
their inception. Each of the several codifiers has, however,
included the statute in his compilation as part of the existing
laws (2 Hill's Code, § 229; Code of 1896, § 4616; 2 Ballin-
ger's Code, § 5464; Pierce's Code, § 456; Rem. & Bal. Code,
§ 749).

The code, in the chapter of which this section forms a part
and elsewhere, provides appropriate remedies for carrying
the provision of the section into execution. Section 511 (Rem.
& Bal. Code), especially provides for a writ of execution
against the person; section 513, the form and contents of the
writ, providing that "it shall require the sheriff to arrest the
debtor, and commit him to the jail of the county until he
shall pay the judgment, with interest, or be discharged ac-

cording to law." Section 517 provides that a person arrested
on such execution shall be imprisoned within the jail, or the
liberties thereof, and kept at his own expense until satisfac-
tion of the execution or his legal discharge, "but the plaintiff
shall be liable to the sheriff in the first instance for such ex-
pense as in other cases of arrest in the same manner and to
the same extent as therein prescribed." The "other cases of
arrest" mentioned refer to arrests made prior to the final
judgment in the action, specifically to § 757 of the code.
This section provides:

"The sheriff shall execute the warrant by arresting the
defendant, and keeping him in custody until discharged by
law. And the plaintiff in the first instance, shall be liable
for the sheriff's fees, for the food and maintenance of any
person under arrest, which, if required by the sheriff, shall
be paid weekly in advance. And such fees so paid shall be
added to the costs taxed or accruing in the case, and be col-
lected as other costs. And if the plaintiff shall neglect to pay
such fees for three days after a demand, in writing, upon the
plaintiff or his attorney for payment, the sheriff may dis-
charge defendant out of custody."

No means are provided by which the judgment debtor can
procure his own discharge other than by a payment of the
judgment with interest, together with the costs and accruing
costs. If the judgment debtor is unable to pay, he may be
kept in confinement as long as the judgment creditor wills it;
the judgment creditor has but to pay "for food and mainten-
ance" of the judgment debtor to keep him in confinement for
the term of his natural life. In this regard the statute has all
of the harshness of the ancient common law. Now, in Eng-
land, under the Victorian statutes, the debtor can be released
by taking the poor debtors' oath. And in most of the states of
the Union where imprisonment for failure to pay a judg-
ment is allowed at all, there is either a time limit beyond which
the imprisonment cannot extend, or a means of procuring a
discharge by some act of the debtor himself. The harshness
of the remedy afforded by the act does not, of course, argue

strongly against its constitutionality, but it does, we think, argue strongly in favor of the belief that the people of the state have generally regarded the remedy as obsolete.    Notwithstanding the fact that it has been but infrequently resorted to, we cannot believe that the legislature would have allowed it to remain on the statute books in its present form had they thought that life imprisonment, a punishment now only inflicted for the highest crime known to the law, was a possibility under it.    We believe they would have modified it to a degree more consistent with modern thought and ideas; especially since the mother country, from whom it was borrowed, has long since abolished it as contrary to good public policy.

In the cases cited by the parties from our own reports which are thought to sustain their respective contentions, we. fail to find that the precise question presented has been authoritatively determined, although in the discussion of cognate questions we have touched upon it to some extent, expressing thereon, perhaps, somewhat discordant views.    In *Burrichter v. Cline,* 3 Wash. 135, 28 Pac. 367, the action was upon a foreign judgment, in which the defendant was arrested and held to bail on an affidavit charging that he was about to leave the state with intent to defraud his creditors. The defendant appealed, contending that his arrest was illegal and improvident.    The court sustained his contention "on the ground that, by art. 1, § 17 of the constitution, imprisonment for debt, except in the case of absconding debtors, was abolished, and on the further ground that the affidavits presented to the court, and on which the order of arrest was made, stated no facts sufficient to constitute a cause for arrest under the code (§ 749) if the same had been still operative."    From the language of the court it can be inferred that it was thought an arrest of a defendant in a civil action, except in the case of an absconding debtor, was illegal, no matter what gave rise to the cause of action; but as the record of the case shows that the cause of action on which the

judgment sued upon was founded arose out of contract, the expression of the court can only be taken as indicative of its views, not as an authoritative determination of the question.

In *Colby v. Backus,* 19 Wash. 347, 53 Pac. 367, 67 Am. St. 732, the court had before it the constitutionality of the act permitting a committing magistrate to charge the costs of a criminal proceeding instituted before him, if the complaint be found frivolous or malicious, to the prosecuting witness, and to commit such witness until such costs be paid, or he be discharged by due process of law. It was contended that the statute allowed imprisonment for debt, but the court said that the costs were imposed upon him as a penalty, and "did not constitute strictly and simply a debt any more than the fine imposed upon a party convicted of assault and battery is a debt;" further saying that the "imprisonment which is forbidden by the constitution under art. 1, § 17, relates to liability arising on a contract." This case more nearly touches the question than does the earlier one, but the real question before the court was, after all, whether the legislature could, without violating the constitutional provision cited, impose a penalty for frivolous or malicious prosecutions. In other words, the provision is in the nature of a criminal statute, and it is the frivolity and maliciousness that is punished, not the mere failure to pay a debt. The case, therefore, like the earlier one, cannot be said to be determinative.

In the case of *In re Cave,* 26 Wash. 213, 66 Pac. 425, 90 Am. St. 736, the petitioner was ordered imprisoned for refusing to obey an order of the court directing him to turn over money and property in his possession in satisfaction of a judgment of alimony, costs, and attorney fees, awarded against him in a suit for divorce. It was contended that the order was a violation of the constitution, but the court held otherwise, using this language; "It is well-settled law of this country that a decree or order for alimony in a divorce proceeding is not a debt within the meaning of that term as used in § 17, art. 1, of our constitution." But it is evident that

the real ground of the decision is that imprisonment can be
used as a means of coercing the performance of the order of
the court; to compel the defendant to do a thing which was
in his power to do; not as a punishment for a failure to sat-
isfy a judgment of alimony which he had no means of satis-
fying.   That the judgment of this court would have been
otherwise had it been shown that the defendant was without
property to satisfy the judgment, is evidenced by our later
decision of *Holcomb v. Holcomb*, 53 Wash. 611, 102 Pac.
653, where we held it "always a defense to a proceeding of
this kind to show that the disobedience was not wilful, but
was the result of pecuniary inability or other misfortunes
over which the accused had no control."

In *In re Milecke*, 52 Wash. 312, 100 Pac. 743, 132 Am.
St. 968, 21 L. R. A. (N. S.) 259, we had before us the act
making it a misdemeanor to fail to pay a hotel or board bill.
It was contended that the act was violative of the constitution
prohibiting imprisonment for debt, but the court refused to
sustain the contention, using the following language:

"We cannot read the statute as does counsel for appellant.
It does not in our judgment warrant imprisonment for a debt.
It would be beyond our province to hold that a person could
be imprisoned for a simple contract debt; or, to put it in the
way of counsel for appellant, simply because he did not pay
his hotel bill.   The hotel keeper, if he should undertake to
use the law as a whip to compel the payment of an overdue
account honestly contracted, would himself be subjected to the
penalties of the law, and become liable for damages in a civil
action.   The law under consideration goes no further than to
say that the fraudulent incurring of a debt is a crime.   Ap-
pellant has obtained a thing of value with intent to defraud.
He is liable, as much so as is the one who by fraudulent pre-
tense obtains the goods of a merchant or the money of a
banker."

In further arguing the question, the court stated that the
prohibition contained in art. 1, § 17, of the constitution re-
lated to an obligation arising out of contract, and "is never

extended to cover a tort;" citing and quoting authorities to that effect from other jurisdictions. But, again, we think the question whether the constitutional prohibition related to judgments founded upon torts was not strictly before us. It was, of course, a complete answer to the objection raised to say that the constitutional prohibition did not apply to debts contracted in the manner prohibited, yet the result of the case must have been the same had it been determined that the constitutional inhibition did apply to debts contracted in tort; since in the later case of *State v. Pilling,* 53 Wash. 464, 102 Pac. 230, 132 Am. St. 1080, speaking of a prosecution for drawing a check upon a bank in which drawer had no funds or credit, it was said:

"The contention that the statute authorizes imprisonment for debt, in violation of § 17 of article 1 of the state constitution, is not well founded. The statute punishes the party for his fraud and not for his failure to redeem his check. *In re Milecke,* 52 Wash. 312, 100 Pac. 743, 152 Am. St. 968, 21 L. R. A. (N. S.) 259."

In *State v. McFarland,* 60 Wash. 98, 110 Pac. 792, 140 Am. St. 909, the defendant had been convicted of violating the act relating to the inspection of hotels, inns, and public lodging houses, Rem. & Bal. Code, §§ 6030-6049. The act, among other things, provides for the inspection of such places, and requires the owner, manager or person in charge to pay the cost of such inspection, making it a misdemeanor to refuse to so pay, punishable by imprisonment. The defendant contended that the act was unconstitutional because authorizing imprisonment for debt, and to the extent that the act permitted such imprisonment, the contention was sustained, the court using this language:

"In this case the entire act, purged of the single invalid feature which provides for imprisonment for debt, can and must be sustained. The only alleged criminal offense, with the commission of which the appellant has been charged, is that he did not pay the inspection fee. He cannot be fined

nor imprisoned for any such act, as it cannot be made a criminal offense."

But obviously, notwithstanding the language of the court, the case does not determine, either directly or in principle, the question at bar.

In *Hamilton v. Pacific Drug Co.*, 78 Wash. 689, 139 Pac. 642, it appeared that the plaintiff had been engaged in business at Valdez, Alaska, and had incurred an indebtedness to the Pacific Drug Company. He disposed of his business and embarked for Seattle, arriving there in the nighttime. After his arrival at Seattle, and while he was still in his stateroom, he was arrested on the complaint of the drug company as an absconding debtor, and imprisoned in the county jail of King county. After his discharge, he sued the drug company in damages, alleging an illegal arrest and an unlawful imprisonment. He recovered in the court below, and on the appeal to this court the drug company sought to justify the arrest and imprisonment on the constitutional provision cited. The court held that the constitutional provision was not self-executing, and that there was no statute prescribing a procedure by which its provisions could be carried into effect; saying, with reference to the statute now in question, that the effect of the adoption of the constitutional provision "was to abate the right of arrest in all cases specified" therein. Since, however, the case was one where the debt was contractual, and since the statute does not purport to authorize arrest and imprisonment except "on a cause of action not arising out of contract," the court was clearly right in holding that it did not furnish a procedure for the arrest of an absconding debtor, but the case can hardly be said to determine the question presented in the case at bar.

The authorities cited from other jurisdictions we shall not specially review. They hold with practical unanimity that constitutional provisions prohibiting imprisonment for debt have reference only to contractual debts, not to obligations incurred in the commission of some form of tort.

But notwithstanding our own expressions and the prac-
tically unanimous holdings elsewhere to the contrary, we
have felt compelled to hold the statute inimical to the con-
stitutional provision cited.   As we said on another occasion,
it is a cardinal rule of construction that the language of a
state constitution, more than that of any other of the written
laws, is to be taken in its general and ordinary sense.   The
reason for the rule lies in the fact that its makers are the
people who adopt it.   Its language is their language, and
words employed therein have meaning as the generality of
the people understand them.   When, therefore, words are
used in a constitution which have both a restricted and gen-
eral meaning, the general must prevail over the restricted,
unless the nature of the subject-matter or the context indi-
cates that the limited sense was intended.   Says Mr. Justice
Story:

"Every word employed in the constitution is to be ex-
pounded in its plain, obvious, and common sense, unless the
context furnishes some ground to control, qualify, or enlarge
it.   Constitutions are not designed for metaphysical or logi-
cal subtilities, for niceties of expression, for critical pro-
priety, for elaborate shades of meaning, or for the exercise
of philosophical acuteness or judicial research.   They are in-
struments of a practical nature, founded on the common busi-
ness of human life, adapted to common wants, designed for
common use, and fitted for common understandings.   The
people make them, the people adopt them, the people must
be supposed to read them, with the help of common sense,
and cannot be presumed to admit in them any recondite mean-
ing or any extraordinary gloss."   1 Story, Constitution
(5th ed.), § 451.

So Mr. Sedgwick in his work on Constitutional Law:

"In the consideration of these questions it may be observed
in the first place, that, in the construction of a constitution
the rule is, 'its terms must be taken in the ordinary and com-
mon acceptation, because they are supposed to have been so
understood by the framers and by the people who adopted it.
This is unquestionably the correct rule of interpretation.

It, unlike the acts of our legislature, owes its whole force and authority to its ratification by the people; and they judged it by the meaning apparent on its face according to the general use of the words employed, when they do not appear to have been used in a legal or technical sense.' "

In 6 R. C. L. 52, under the title, "Constitutional Law," it is said:

"Words or terms used in a constitution, being dependent on ratification by the people, must be understood in the sense most obvious to the common understanding at the time of its adoption, although a different rule might be applied in interpreting statutes and acts of the legislature. This gives rise to the recognized rule of construction that it is presumed that words appearing in a constitution have been used according to their plain, natural and usual signification and import, and the courts are not at liberty to disregard the plain meaning of words of a constitution in order to search for some other conjectured intent. This rule does not apply, however, to technical words and phrases which necessarily should be given a technical signification."

And in *Epping v. Columbus*, 117 Ga. 263, 43 S. E. 803, Justice Cobb, speaking of the word "debt" as used in the constitution of Georgia, used this language:

"Constitutions are the result of popular will, and their words are to be understood ordinarily as used in the sense that such words convey to the popular mind. 6 Am. & Eng. Enc. L. (2d ed.) 924-5. There is nothing in the paragraph under consideration which indicates that the term 'debt' was used in any other way than in its ordinary and popular sense. If a person unversed in the technical niceties of the law is asked what is the amount of his debts, his answer to the question in every instance would be an amount which would represent the present liability that he is under at the moment the question is answered. A farmer who has been so unfortunate as to be compelled to place a long loan upon his farm, if asked what was the amount of the debt upon his farm, would unhesitatingly answer by giving an amount which would represent the principal of the debt and any interest that was past due and payable at the time the inquiry was made. One who, in making a return of his property for

taxation, is required to state to the tax-receiver the amount of solvent debts due him would not, in the case of a perfectly solvent debt, consider that he was under a moral obligation to return for taxation the value of the debt at any higher amount than one which would represent the principal and any interest that was past due at the time the return was made. It is useless to multiply illustrations. The debt of an individual, or a corporation, or the public, in its usual and popular sense, means the amount for which the individual or corporation or the public would be presently liable if called upon to discharge the obligation. The law deals at all points with the man of ordinary prudence and average capacity as the standard, for the simple reason that communities and commonwealths are made up of persons of this class. Constitutions are adopted by commonwealths so made up, and the meaning to be given to such instruments is that meaning which the man of ordinary prudence and average intelligence and information would give. Generally the meaning given to words by the learned and technical is not to be given to words appearing in a constitution. In other words, the popular meaning is to be given to the words of a constitution, unless the context or the instrument taken as a whole imperatively requires some other meaning. Before the words can be given a purely technical meaning which would be different from the popular meaning, the intention that they should be so understood must be plainly apparent and palpably manifest."

Turning to the constitutional provision now in question, it is at once apparent that the word "debt" therein was used in its popular and general sense. The prohibition is contained in a separate section. It is a simple declaration that there shall be no imprisonment for debt except in cases of absconding debtors. Nothing in the context or subject-matter indicates that it is otherwise limited, nor do we find elsewhere in the constitution anything that indicates that it was intended to be otherwise limited. The question then arises, how was the term "debt" understood in its general and ordinary signification at the time of the adoption of the constitution? Obviously, it seems to us, it was understood to

signify obligations due from one person to another of every character, which would include judgments entered in actions *ex delicto* as well as in actions *ex contractu*. The one is as much of an obligation as is the other. Apart from the particular section in question, the same provision has been made by law for the collection of the one as for the collection of the other; in each class the property of the judgment debtor can be seized and sold for the satisfaction of the sum awarded, under an ordinary writ of execution. Again, other provisions of the statute indicate that such is its meaning. The statute, for example, provides for bail upon arrest, for sureties in attachment proceedings, for sureties on the bonds required of public officers, on the bonds of executors and administrators, on bonds of litigants required to secure costs in certain cases, and under multifarious other conditions, all of whom are required to justify that they were worth the sum for which they become sureties, over and above all of their just debts and liabilities. Surely no such obligor or surety would be permitted to escape punishment under the statute making it a criminal offense to take a false oath in such cases, by showing that the debt which he had overlooked when taking the oath was a judgment in an action arising in tort.

The lexicographers, both ancient and modern, include such a judgment in their definition of the term "debt." Sir Edward Coke, commenting on the word *debitum* as used in the statute of Merton, says: "Debitum signifieth not only debt for which an action of debt doth lie, but here in this ancient act of parliament, it signifieth generally any duty to be yielded or paid." Burrill, in his law dictionary, says: "The word debt is of large import, including not only debts of record or judgment, and debts by specialty, but also obligations arising under simple contract to a very wide extent, and in its popular sense includes all that is due to a man under any form of obligation or promise." Bouvier defines the word as, "All that is due a man under any form

of obligation or promise;" and "Judgment Debt," as "One
which is evidenced by matter of record." Webster's Inter-
national Dictionary defines it as, "That which is due from
one person to another, whether money, goods, or services;
that which one person is bound to pay to another or to
perform for his benefit; thing owed; obligation; liability."
Definitions given by the courts of the term "debt" will be
found collected in Cyc. under the title, "Debt." None of
them deny that, in ordinary acceptation, a judgment founded
upon a tort is a debt, and some of them expressly so state.
*Mertz v. Barry*, 101 Mich. 32, 59 N. W. 445, 45 Am. St.
379, 24 L. R. A. 789; *Carr v. State*, 106 Ala. 35, 17 South.
350, 54 Am. St. 17, 34 L. R. A. 634; *Dellinger v. Tweed*,
66 N. C. 206; *Hampton v. Truckee Canal Co.*, 19 Fed. 1;
*Smith v. Omans*, 17 Wis. 406; *Turner v. Wilson*, 49 Ind.
581; *Hunter v. Windsor*, 24 Vt. 327; *Carver v. Braintree
Manufacturing Co.*, 2 Story, 432, 448, Fed. Cas. No. 2,485.

If these considerations be sound, it follows as of course
that the constitutional inhibition applies to a judgment in
an action of tort; for if it be the rule that the words of the
constitution must be construed in their general and ordinary
sense, and it is further true that a judgment founded on
tort is a "debt" within the general or ordinary meaning of
that term, there is no escape from the conclusion that the
people in adopting the constitution meant to prohibit im-
prisonment on judgments founded on tort.

Another reason which leads us to the conclusion that judg-
ments in actions for torts are debts within the meaning of
the constitution is found in the fact that the prohibition with
respect to imprisonment for debt therein is broader and
more sweeping in its terms than are the constitutions of the
states whose courts maintain a contrary doctrine. In so far
as our researches have gone, the constitutions of such states
contain exceptions to the general declaration which ma-
terially narrow its scope and effect. Ours, it will be observed,
is without limitation as to the character of the debt, the

only exception being cases of absconding debtors, which is as applicable to debts evidenced by judgments founded on contract as it is to judgments founded on tort. This distinction we cannot think to be without meaning. It would seem that, had the makers of the constitution intended that there should be limitations to the broad expression used, they would have so stated in express terms, or at least in the terms of the existing constitutions under which the limitations had been declared. *Ex parte Hardy*, 68 Ala. 303; *Carr v. State, supra; Ex parte Prader*, 6 Cal. 239.

But there is a reason, aside from the ones discussed, why in this state the penalty of imprisonment should not be imposed in a civil action, be its nature what it may, other than in the one case in which the constitution especially permits it. It is violative of the public policy of the state as announced by the courts and acquiesced in by the legislature. The reason why a judgment in an action in tort is thought not to be within the clause of the constitution prohibiting imprisonment for debt is as well stated in the case of *United States v. Walsh*, 1 Deady 281, Fed. Cas. No. 16,635, as in any of the adjudicated cases. It is there said:

"A person who willfully injures another in person, property, or character, is liable therefor in damages. In some sense he may be called the debtor of the party injured, and the sum due for the injury a debt. But he is in fact a wrong doer, a trespasser, and does not come within the reason of the rule which exempts an honest man from imprisonment, because he is pecuniarily unable to pay what he promised to. For instance, a person who wrongfully beats his neighbor, kills his ox, or girdles his fruit trees ought not to be considered in the same category as an unfortunate debtor. He ought to be liable to arrest in action for damages by the party injured. Deny him this remedy, and in the majority of such cases it would amount to a denial of justice, and a deliberate repudiation and disregard of the injunction contained in section 10 of the same article—'every man shall have remedy by due course of law for injury done him in person, property or reputation.' It may be admitted that a

penalty given by statute is technically a debt. It does not, however, arise upon contract, but by operation of law. It is imposed as a quasi punishment for the violation of law or the neglect or refusal to perform some duty to the public or individuals enjoined by law. Penalties are imposed in furtherance of some public policy, and as a means of securing obedience to law. Persons who incur them are either in morals or law, wrong-doers, and not simply unfortunate debtors unable to perform their pecuniary obligations. I do not think the constitutional provision prohibiting imprisonment for debt was intended to apply to or include such cases."

In other words, the reason for the rule lies in the fact that the action is not only compensatory, but is vindictive and punitive, and in the nature of quasi-punishment for the violation of law. But this court early announced, and has consistently adhered to the rule, that vindictive, exemplary, or punitive damages are not recoverable in this state unless the legislature had expressly so provided; that compensation is the fundamental principle of the law of damages; the right to punish for crime being the prerogative of the state. *Spokane Truck & Dray Co. v. Hoefer*, 2 Wash. 45, 25 Pac. 1072, 26 Am. St. 842, 11 L. R. A. 689; *Sloan v. Langert*, 6 Wash. 26, 32 Pac. 1015; *Atrops v. Costello*, 8 Wash. 149, 35 Pac. 620; *Levy v. Fleischner*, 12 Wash. 15, 40 Pac. 384; *Davis v. Tacoma R. & Power Co.*, 35 Wash. 203, 77 Pac. 209, 66 L. R. A. 802; *Woodhouse v. Powles*, 43 Wash. 617, 86 Pac. 1063, 117 Am. St. 1079, 8 L. R. A. (N. S.) 783; *Helland v. Bridenstine*, 55 Wash. 470, 104 Pac. 626; *Corcoran v. Postal Telegraph-Cable Co.*, 80 Wash. 570, 142 Pac. 29, L. R. A. 1915 B 552.

The reason for the rule is forcefully and vigorously stated by Judge Dunbar in the case first cited. After quoting the statement of Greenleaf, to the effect that damages are given as a compensation or satisfaction to the plaintiff for an injury actually received, and that they should be precisely commensurate with the injury, the learned and distinguished jurist continues as follows:

"It seems to us that there are many valid objections to interjecting into a purely civil action the elements of a criminal trial, intermingling into a sort of a medley or legal jumble two distinct systems of judicial procedure. While the defendant is tried for a crime, and damages awarded on the theory that he has been proven guilty of a crime, many of the time honored rules governing the trial of criminal actions, and of the rights that have been secured to defendants in criminal actions 'from the time whereof the memory of man runneth not to the contrary,' are absolutely ignored. Under this procedure, the doctrine of presumption of innocence until proven guilty beyond a reasonable doubt finds no lodgment in the charge of the court, but is supplanted by the rule in civil actions of a preponderance of testimony. The fallacy and unfairness of the position is made manifest when it is noted that a person can be convicted of a crime, the penalty for which is unlimited save in the uncertain judgment of the jury, and fined to this unlimited extent for the benefit of an individual who has already been fully compensated in damages on a smaller weight of testimony than he can be in a criminal action proper, brought for the benefit or protection of the state, where the amount of the fine is fixed and limited by law; and, in addition to this, he may be compelled to testify against himself, and is denied the right to meet the witnesses against him face to face under the practice in civil actions of admitting depositions in evidence.

"Exclusive of punitive damages, the measure of damages as uniformly adopted by the courts and recognized by the law is exceedingly liberal towards the injured party. There is nothing stinted in the rule of compensation. The party is fully compensated for all the injury done his person or his property, and for all losses which he may sustain by reason of the injury, in addition to recompense for physical pain, if any has been inflicted. But it does not stop here; it enters the domain of feeling, tenderly inquires into his mental sufferings, and pays him for any anguish of mind that he may have experienced. Indignities received, insults borne, sense of shame or humiliation endured, lacerations of feelings, disfiguration, loss of reputation or social position, loss of honor, impairment of credit, and every actual loss, and some which frequently border on the imaginary, are paid for under the

rule of compensatory damages. The plaintiff is made entirely whole. The bond has been paid in full. Surely the public can have no interest in exacting the pound of flesh. Ordinarily the administration of the laws is divided into two distinct jurisdictions, the civil and the criminal, each governed by rules of procedure and by rules governing the admission and weight of testimony different and distinct from the other. The province of the civil court is, as its name indicates, to investigate civil rights. There its jurisdiction ends, or ought to end; while the province of the criminal court is, as its name imports, to investigate and punish crime and restrain its commission. And it is to the criminal and not to the civil jurisdiction that society looks for its protection against criminals. The object of punishment is not to deter the criminal from again perpetrating the crime on the particular individual injured, but for the protection of society at large; and as the state is at the expense of restraining and controlling its criminals, and as fines are imposed for the double purpose of restraining the offender and of reimbursing the state for its outlay in protecting its citizens from criminals, we are at a loss to know by what process of reasoning, either legal or ethical, the conclusion is reached. that a plaintiff in a civil action, under a complaint which only asks for compensation for injuries received, is allowed to appropriate money which is supposed to be paid for the benefit of the state. It is to be presumed that the state has fully protected its own interests, or as fully at least as they could be protected by laws, when it provides for the punishment of crime in its criminal statutes, and fixes the fine at a sum which it deems commensurate with the crime designated; hence, punitive damages cannot be allowed on the theory that it is for the benefit of society at large, but must logically be allowed on the theory that they are for the sole benefit of the plaintiff, who has already been fully compensated; a theory which is repugnant to every sense of justice."

Since the announcement of this rule, the legislature has not, in so far as we are advised, with the possible exception of one or two instances, and in these seemingly by inadvertence, permitted the recovery of exemplary and punitive damages as a part of the remedy for an act which it has prohibited as a wrong. It has not so provided for the com-

mission of the act for which recovery was had in the present action, although it has made the act felony, and has subjected offenders against it to prosecution as other offenders are prosecuted who violate the laws of the state. Since the reasons for holding that the constitutional inhibition does not operate against judgments founded on tort does not obtain in this state, but is violative of its policy as expressed by its courts, it would seem that the rule itself should not obtain.

For these reasons, we are constrained to hold that the judgment of the court is violative of the section of the constitution prohibiting imprisonment for debt, and that the court erred in overruling the defendant's motion for his discharge.

The order appealed from is reversed, and the cause remanded with instructions to discharge the defendant.

MORRIS, C. J., MOUNT, ELLIS, and MAIN, JJ., concur.